**Jane DOE, Plaintiff,**

v.

**Father Gerald HARTZ, Bishop Lawrence Soens, St. Lawrence Church, and Roman Catholic Diocese of Sioux City, Iowa, Defendants.**

**No. C98–4084–MWB.**

United States District Court,
N.D. Iowa,
Western Division.

May 5, 1999.

See also 134 F.3d 1339.

Tiffany B. Klosener, Roxanne Barton Conlin, Roxanne Conlin & Associates, P.C., Des Moines, Iowa, for Jane Doe, plaintiff.

Scot L. Bauermeister, Fitzgibbons Law Firm in Estherville, Iowa, for Father Gerald Hartz, defendant.

Maurice B. Nieland of Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, Sioux City, Iowa, St. Lawrence Church, Bishop Soens, and the Roman Catholic Diocese of Sioux City, Iowa, for defendants.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS TO DISMISS

BENNETT, District Judge.

### TABLE OF CONTENTS

I. *INTRODUCTION* ................................................1035
 A. *Synopsis* .................................................1035
 B. *The Claims* ..............................................1036
 C. *Procedural Background* ...................................1038

II. *LEGAL ANALYSIS* ............................................1038
 A. *Procedural Bars* .........................................1038
 1. *Lack of diversity jurisdiction* .....................1038
 a. *Rules of diversity jurisdiction* ................1039
 b. *Diversity here* .................................1039
 2. *Timeliness of Doe's claims* ........................1040
 a. *Iowa's "savings" statute* .......................1041
 b. *Applicability of the statute* ...................1041
 i. *Negligence* .................................1041
 ii. *Other prerequisites* .......................1043
 iii. *The same cause of action* .................1044
 3. *Failure to sue in plaintiff's proper name* .........1044
 a. *Pertinent factors* ..............................1045
 b. *Application of the factors* .....................1047
 B. *Substantive Challenges* ..................................1049
 1. *Standards for a Rule 12(b)(6) dismissal* ...........1049
 2. *Sexual abuse* ......................................1050
 a. *"Sexual abuse" within the meaning of § 709.1* ...1050
 b. *"Sexual exploitation" within the meaning of § 709.15* ...1051
 c. *Assault and battery* ............................1052
 3. *Fraud* .............................................1054
 a. *Elements and pleading* ..........................1055
 b. *Doe's allegations* ..............................1056
 4. *Breach of fiduciary duty* ..........................1058
 a. *When does the duty arise?* ......................1058
 b. *Breach of fiduciary duty of clergy* .............1059
 c. *Duty and breach here* ...........................1062
 i. *The Diocese and Soens* ......................1062
 ii. *Defendant Hartz* ...........................1062
 5. *Assault* ...........................................1066
 6. *Tortious infliction of severe emotional distress* ..1067
 a. *Elements of the claim* ..........................1068
 b. *"Outrageousness" of Hartz's conduct* ............1069
 7. *Negligence claims against defendant Hartz* .........1070
 a. *Count VII* ......................................1071
 b. *Count VIII* .....................................1072
 8. *Negligence claims against the Church Defendants* ...1072
 9. *Premises liability* ................................1074
 10. *Respondeat superior liability* ....................1074
 a. *The Godar decision* .............................1075
 b. *Does Godar foreclose respondeat superior liability here?* ...1076
 11. *A constitutional bar?* ............................1078
III. *CONCLUSION* ...............................................1079

What are the consequences of an unsolicited kiss and a rub on the back? When the person who allegedly imposed such a kiss and a rub is a parish priest, the

plaintiff contends it is liability of the priest, bishop, church, and diocese for the priest's misconduct. Not content with asserting a claim for simple assault or battery as a basis for defendants' liability, the plaintiff has advanced a startling dozen theories of liability. The defendants contend that the plaintiff's outrage has gotten the better of her judgment, because they argue that none of the plaintiff's many causes of action states a claim upon which relief can be granted. As is too often true, in their zeal, both sides of the controversy have overstated their case. Lacking a Herculean solution to plaintiff's Hydra-headed [1] complaint and the defendants' multi-pronged attack attempting to dismiss it, the court must address each of the contentions raised by the parties.

## I. INTRODUCTION

### A. Synopsis

Anonymous plaintiff Jane Doe filed her complaint in this action on September 16, 1998, naming as defendants Father Gerald A. Hartz, who is a priest at St. Lawrence Church, in Carroll, Iowa; St. Lawrence Church itself; the Roman Catholic Diocese of Sioux City, Iowa; and Bishop Lawrence Soens, the bishop of the defendant Diocese. Where circumstances warrant, the latter three defendants will be referred to as the "Church Defendants." The gravamen of Doe's complaint is that, on December 3, 1994, when she arrived at St. Lawrence Church to sing during evening mass, defendant Hartz "came up behind her, grabbed her with both of his hands and pulled her back into his body, held her tightly and kissed her neck." Complaint, ¶ 12. Later that same evening, after mass, "Defendant Hartz rubbed Plaintiff's back up and down with his hand." *Id.* at ¶ 15.

Doe asserts twelve state-law claims based on these incidents or related events.

The present lawsuit is a reincarnation of a lawsuit filed on August 29, 1996, *see Doe v. Hartz,* 970 F.Supp. 1375 (N.D.Iowa 1997), but dismissed at the behest of the Eighth Circuit Court of Appeals for lack of subject matter jurisdiction on July 8, 1998. *See Doe v. Hartz,* 134 F.3d 1339 (8th Cir. 1998). Indeed, all of Doe's factual allegations in the renewed complaint are *verbatim* repleadings—with only incidental corrections of typographical errors—of the facts alleged in support of Doe's original complaint. *Compare* Complaint of August 29, 1996 (hereinafter "Original Complaint"), ¶¶ 9–28; *with* Complaint of September 16, 1998 (hereinafter "Present Complaint"), ¶¶ 10–29.

In her Original Complaint, Doe alleged thirteen claims, based on state and federal law, including a claim under the Violence Against Women Act (VAWA), 42 U.S.C. § 13981, which was the basis for her assertion of federal question jurisdiction. The Eighth Circuit Court of Appeals found the VAWA claim wanting—thus eliminating a federal question as the basis for subject matter jurisdiction—and directed that the Original Complaint be dismissed without prejudice to refiling in state court. *Doe,* 134 F.3d at 1344. However, Doe has instead refiled the Present Complaint—omitting only her VAWA claim—in this federal court asserting diversity jurisdiction, because she is now a citizen of Illinois. Doe specifically alleges that the present action is "saved" from the bar of the applicable statute of limitations pursuant to Iowa Code § 614.10, because her Original Complaint was dismissed without prejudice through no fault of her own, then refiled within six months, and thus must be con-

---

**1.** Hydra, sometimes called the "Lernean hydra," was a many-headed serpent (usually described as having nine heads, actually less than the number of plaintiff's claims) slain by Hercules, who had to overcome the problem that every time he cut off one of Hydra's heads, it was replaced by two others. Hercules solved the problem by convincing his char-

ioteer to burn the stumps as soon as Hercules knocked off one of Hydra's heads, thus preventing the double regrowth. See, e.g., Funk and Wagnalls Standard Dictionary of Folklore, Mythology, and Legend 615 (Maria Leach, ed., Funk & Wagnalls, 1972); Thomas Bullfinch, Mythology 144 (Fuller abridged ed.1959).

sidered to be a continuation of the first action for statute of limitations purposes.

## B. The Claims

With the exception of the VAWA claim, which has been eliminated from the present lawsuit, the claims of the Present Complaint "track," but are not necessarily identical to, the claims of the Original Complaint. Thus, Doe once again asserts claims of sexual abuse by defendant Hartz; fraud by all defendants; breach of fiduciary duty by defendants Diocese and Soens; breach of fiduciary duty by defendant Hartz; assault by defendant Hartz; tortious infliction of emotional distress by defendants Hartz, Soens, and Diocese; two separate claims of negligence by defendant Hartz; negligent supervision by the Church Defendants; another claim of negligence by defendants Church and diocese; premises liability of defendant St. Lawrence Church; and *respondeat superior* liability of defendant St. Lawrence Church. In the table that follows, the claims of the Original and the Present Complaints are correlated, with a recitation of the gravamen of each claim and the manner, if any, in which the claim has been revised in the Present Complaint.

| Count of Original Complaint | Shorthand Description | Count of Present Complaint | Gravamen of Claim ) (With references to the Present Complaint | Revision in Present Complaint |
|---|---|---|---|---|
| 1 | VAWA claim | — | Violation of the civil remedies provision of the VAWA, 42 U.S.C. § 13981. | Deleted |
| 2 | Sexual abuse | I | "On December 3, 1994, at approximately 4:35 p.m. in the sacristy of the St. Lawrence Church, Defendant Hartz fondled and kissed the Plaintiff for the purpose of arousing and/or satisfying his sexual desires. Defendant Hartz again fondled Plaintiff following the mass." ¶ 30. | None |
| 3 | Fraud | II | "As a priest, Defendant Hartz fraudulently misrepresented to Plaintiff that he could be trusted to not fondle and kiss Plaintiff in a sexual manner by holding himself out as celibate and as a personal fiduciary. Defendant Hartz also fraudulently misrepresented to Plaintiff that Defendant Hartz, as a priest, could be trusted and respected as a representative of the church and of God." ¶ 37. "Defendants had knowledge of the falsity of Defendant Hartz's material misrepresentations" and "intended to deceive Plaintiff to save themselves, the church, and the congregation the embarassmant of admitting there was a priest in ST. Lawrence Church that had a problem with sexual abuse. Defendants also intended to foster continued confidence in the institution." ¶¶ 46–47. | None |
| 4 | Breach of fiduciary duty as to defendants Diocese and Soens | III | "Defendants [Diocese and Soens] had fiduciary obligations to act in the best interests of the Plaintiff" and "breached this duty . . . by failing to notify Plaintiff that she was in danger of being the victim of sexual abuse at the hands of Defendant Hartz [and] by failing to provide Defendant Hartz with professional counseling services to protect Plaintiff from being sexually abused by Defendant Hartz." ¶¶ 46–47. | None |
| 5 | Breach of fiduciary duty as to defendant Hartz | IV | "As a member of the clergy, Defendant Hartz had fiduciary obligations to act in the best interests of the Plaintiff. Among these obligations was the obligation to not sexually abuse the Plaintiff [and] Defendant Hartz breached this duty when he fondled and kissed the Plaintiff for the purpose of arousing and/or satisfying his sexual desires." ¶¶ 50–51. | None |
| 6 | Assault | V | "After Defendant Hartz sexually assaulted Plaintiff, he placed Plaintiff in fear of offensive physical contact." ¶ 54. | $None |

| Count of Original Complaint | Shorthand Description | Count of Present Complaint | Gravamen of Claim (With references to the Present Complaint | Revision in Present Complaint |
|---|---|---|---|---|
| 7 | Tortious infliction of severe emotional distress | VI | "Defendant Hartz sexually abused Plaintiff on December 3, 1994." ¶ 60. "The Defendants [Soens and Diocese] knew or should have known of the tendency of Father Hartz to abuse women and purposely concealed his conduct from persons in Plaintiff's position [and][w]hen Plaintiff reported Father Hartz's conduct, Defendants [Soens and Diocese] harassed and discouraged her and tried to convince her she was at fault, exploited and ostracized her and ultimately drove her from her hometown and from Iowa." ¶¶ 61–62. "The conduct of the Defendants toward the Plaintiff was so outrageous as to go beyond all possible bounds of decency, and is to be regarded as atrocious and utterly intolerable in a civilized community." ¶¶ 63. | Asserted in the Original Complaint only against defendant Hartz. Specifically asserted against defendants Hartz, Soens, and Diocese in the Present Complaint. |
| 8 | Negligence as to defendant Hartz | VII | "Defendant Hartz suffers from a mental disease or defect which renders him unable to control his conduct in connection with sexual behavior toward women and girls [and][a]s a result of [his] disease or defect, his acts against Plaintiff were not intentional, but were negligent in the particulars set forth above." ¶¶ 68–69. | None |
| 9 | Second count of negligence as to defendant Hartz | VIII | "At all times … Defendant Hartz displayed the characteristics of a person suffering from a mental disease or defect that renders him unable to control his conduct in connection with sexual behavior toward women and girls"; he "had a duty to restrain himself from sexually abusing Plaintiff" and "to obtain professional help to treat his mental disease or defect and to refrain from sexually abusing Plaintiff"; and "Defendant Hartz failed in both of these duties." ¶¶ 70–73 | None |
| 10 | Negligent supervision | IX | "Defendants caused the above-described injuries to Plaintiff by failing to properly supervise the conduct of Defendant Hartz" in several ways, including but not limited to, the following: "(a) failure to provide professional help to a representative agent and/or employee with known or suspected tendencies toward sexual abuse and exploitation; (b) failure to prevent Defendant Hartz from engaging in sexual abuse; (c) failure to reprimand or to take punitive action toward Defendant Hartz; (d) failure to supervise and/or control Defendant Hartz to ensure sexual [abuse] did not occur; (e) failure to respond to previous allegations that Defendant Hartz engaged in sexually inappropriate behavior" which conduct "manifests a deliberate indifference to the duty to hire, retain, and supervise, and to protect the rights of sexual abuse victims, such as the Plaintiff." ¶¶ 76–78. | Asserted in the Original Complaint as "negligent hiring, training, and supervision." Asserted in the Present Complaint only as "negligent supervision," although ¶ 78 still refers to "failure of Defendants to hire, retain, and supervise the conduct of Defendant Hartz." |
| 11 | Negligence as to defendants Church and Diocese | X | "Defendants [Church and Diocese] knew Defendant Hartz suffers from a mental disease or defect which renders him unable to control his conduct in connection with sexual behavior toward women and girls"; they "had a duty to protect Plaintiff from the abuse imposed on her by Defendant Hartz"; and they "failed in their duty to protect Plaintiff." ¶¶ 80–82. | None |
| 12 | Premises liability as to defendant Church | XI | "Defendant St. Lawrence Church knew, or in the exercise of reasonable care should have known, that Plaintiff's abuser was present on its premises and that he impose [sic] an unreasonable risk of injury to a person in Plaintiff's position"; "Defendant St. Lawrence Church knew, or in the exercise of reasonable care should have known, that Plaintiff would be unable to protect herself"; and "Defen- | None |

dant St. Lawrence Church were [sic] negligent in failing to protect Plaintiff from her abuser." ¶¶ 87–89.

| 13 | Respondeat superior liability as to defendant Church | XII | "When committing the acts alleged herein, Defendant Hartz was the representative agent and/or employee of Defendant St. Lawrence Church and Defendant Roman Catholic Diocese of Sioux City, Iowa and was acting within the scope of his representative agency and/or employment. The Defendants require of Defendant Hartz that he dispose of all his worldly good, thereby rendering him judgment proof and personally unable to respond in damages for his intentional and negligent conduct toward the Plaintiff." ¶ 92. | None. N.B.: Although the factual allegations refer to defendants Church and Diocese, the prayer for relief on this claim is for judgment only against defendant St. Lawrence Church. |

## C. Procedural Background

As mentioned above, the Present Complaint was filed on September 16, 1998, with a demand for a jury trial. The Church Defendants moved to dismiss the complaint on December 7, 1998, and defendant Hartz followed suit by moving to dismiss on December 28, 1998. The defendants were granted extensions of time to file briefs in support of their motions to dismiss and consequently Doe was also granted extensions of time to resist those motions. The Church Defendants filed their brief in support of their motion to dismiss on January 11, 1999, and defendant Hartz filed his brief on January 22, 1999. Doe ultimately filed her resistance briefs on February 23, 1999. Discovery has been stayed pending disposition of the motions to dismiss.

The court heard oral arguments on the defendants' motions on April 9, 1999. Plaintiff Jane Doe was represented by Tiffany B. Klosener of Roxanne Conlin & Associates, P.C., in Des Moines, Iowa. Defendant Father Gerald Hartz was represented by Scot L. Bauermeister of the Fitzgibbons Law Firm in Estherville, Iowa. The Church Defendants—defendants St. Lawrence Church, Bishop Soens, and the Roman Catholic Diocese of Sioux City, Iowa—were represented by Maurice B. Nieland of Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser in Sioux City, Iowa. The oral arguments were spirited and informative, continuing the able representation demonstrated by the briefing of the parties. With these motions now fully submitted, the court turns to its legal analysis.

## II. LEGAL ANALYSIS

Although the defendants assert that none of Doe's many causes of action states a claim upon which relief can be granted, they initially assert various procedural bars to Doe's claims. The defendants contend that this court lacks subject matter jurisdiction over the Present Complaint, because diversity of citizenship was lacking at the time the action was originally filed. They also assert that all of Doe's claims are untimely, because they are not "saved" by IOWA CODE § 614.10. As their last procedural bar, the defendants contest Doe's prosecution of this lawsuit under a pseudonym. The court will consider these procedural bars first.

### A. Procedural Bars

#### 1. Lack of diversity jurisdiction

Defendants first contend that this matter must be dismissed for lack of subject matter jurisdiction, because diversity jurisdiction was not present at the time the Original Complaint was filed. They argue that Doe should not be allowed to "have it both ways" by contending that this lawsuit is a "continuation" of the prior lawsuit for statute of limitations purposes—and diver-

sity of citizenship did not exist at the time the Original Complaint was filed—but a new lawsuit for diversity jurisdiction purposes. Doe's short answer to this argument is that diversity of citizenship undeniably existed at the time the Present Complaint was filed, which is the only time relevant to a determination of federal diversity jurisdiction. She contends further that her action has been properly refiled pursuant to the Iowa "savings" statute, because nothing precludes application of that statute to refiling of state-law claims in *federal* court, if grounds for federal jurisdiction now exist.

### a. Rules of diversity jurisdiction

 The Eighth Circuit Court of Appeals recently summarized "the well-established rules of federal diversity jurisdiction" as follows:

> First, we determine diversity of citizenship at the time an action is filed. *See Sheehan v. Gustafson,* 967 F.2d 1214, 1215 (8th Cir.1992). Second, complete diversity of citizenship jurisdiction under 28 U.S.C. § 1332(a) is tested by the citizenship of the real parties to the controversy, and the citizenship of an agent who merely sues on behalf of the real parties must be ignored. *See Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 461, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980); *Iowa Pub. Serv. Co. v. Medicine Bow Coal Co.,* 556 F.2d 400, 404 (8th Cir.1977); *Airlines Reporting Corp. v. S & N Travel, Inc.,* 58 F.3d 857, 861–62 (2d Cir.1995). Third, the Federal Rules of Civil Procedure have no bearing on the requirements of federal diversity jurisdiction. *See Navarro Sav. Ass'n,* 446 U.S. at 462 n. 9, 100 S.Ct. 1779, 64 L.Ed.2d 425; *Iowa Pub. Serv. Co.,* 556 F.2d at 404 n. 5; *Airlines Reporting Corp.,* 58 F.3d at 861 n. 4; Fed.R.Civ.P. 82. Finally, the district court cannot retroactively create diversity jurisdiction if it did not exist when the complaint was filed. *See Sta–Rite Indus., Inc. v.*

*Allstate Ins. Co.,* 96 F.3d 281, 285 (7th Cir.1996); *Aetna Cas. & Sur. Co. v. Hillman,* 796 F.2d 770, 775–76 (5th Cir. 1986). Instead, the district court must dismiss the action. *See Aetna Cas. & Sur. Co.,* 796 F.2d at 776.

*Associated Ins. Mgmt. Corp. v. Arkansas Gen. Agency, Inc.,* 149 F.3d 794, 797 (8th Cir.1998); *see also Freeport–McMoRan, Inc. v. KN Energy, Inc.,* 498 U.S. 426, 428, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991) (diversity of citizenship is determined at the time the complaint is filed). A corollary to the rule that diversity is determined at the time of filing is equally well-established: "[I]f diversity did not exist when the complaint was filed, it cannot be created by a change of domicile by one of the parties or some other event." *Saadeh v. Farouki,* 107 F.3d 52, 57 (D.C.Cir.1997) (citing, *inter alia, Anderson v. Watt,* 138 U.S. 694, 702–03, 11 S.Ct. 449, 34 L.Ed. 1078 (1891)). The party attempting to establish federal jurisdiction bears the burden of proof if diversity of citizenship is challenged. *See, e.g., Quality Refrig. Servs., Inc. v. City of Spencer,* 908 F.Supp. 1471, 1483 (N.D.Iowa 1995) (citing cases so holding).

### b. Diversity here

 In this case, diversity of citizenship plainly existed *at the time this action was filed,* because no one contests that at the time Doe filed the Present Complaint, she was a citizen of Illinois. *See Freeport–McMoRan, Inc.,* 498 U.S. at 428, 111 S.Ct. 858; *Associated Ins. Mgmt. Corp.,* 149 F.3d at 797. Doe did not "create" diversity during the pendency of the present lawsuit, *compare Saadeh,* 107 F.3d at 57, but instead established Illinois citizenship during (or prior to) the hiatus between separate—albeit nearly identical—lawsuits, the first of which had been involuntarily dismissed.

Although there is some appeal to the defendants' "having it both ways" argument, the court concludes that the defen-

dants have attempted to combine two entirely separate inquiries: whether this court has subject matter jurisdiction, and whether, if jurisdiction exists, Doe's claims are timely. Both determinations undeniably require taking a "snapshot" at the time the case was filed. However, determination of diversity jurisdiction requires that the court look only at the circumstances at the time of the "snapshot," *Freeport–McMoRan, Inc.*, 498 U.S. at 428, 111 S.Ct. 858; *Associated Ins. Mgmt. Corp.*, 149 F.3d at 797; but, as explained more fully below, determination of timeliness requires consideration of the "snapshot" as the starting point for a more extensive inquiry—the point from which the court must look back to the events giving rise to the claims, determine the applicable statute of limitations, determine whether the claim has been filed within the requisite limitations period, and finally determine whether anything "saves" an otherwise untimely claim. To put it another way, diversity of citizenship is a question of subject matter jurisdiction, challenged via Rule 12(b)(1) of the Federal Rules of Civil Procedure, while untimeliness is a question of whether the plaintiff has stated a claim upon which relief can be granted, a matter challenged via Rule 12(b)(6). The court could, of course, conclude that it has subject matter jurisdiction, but that the claims must nonetheless be dismissed as untimely. If the court lacks subject matter jurisdiction, it would be inappropriate for the court even to reach the statute of limitations question.

Therefore, the defendants' motions to dismiss for lack of diversity subject matter jurisdiction must be denied.

### 2. Timeliness of Doe's claims

The court now turns to the second inquiry mentioned above, the defendants' challenge to the timeliness of Doe's claims and their assertion that her claims are not "saved" by Iowa Code § 614.10. The defendants argue that Doe's claims are for personal injuries suffered on or about December 3, 1994, to which a two-year statute of limitations applies, *see* Iowa Code § 614.1(2), but the Present Complaint was not filed until almost four years later, on September 16, 1998, well outside the limitations period. The defendants next assert that Doe's claims are not "saved," because dismissal of Doe's Original Complaint was the result of counsel's negligence in asserting an untenable federal claim—the VAWA claim—as the basis for federal jurisdiction. They argue that counsel's negligence is apparent from the "short shrift" given Doe's VAWA claim by the Eighth Circuit Court of Appeals. They therefore argue that this case is "almost identical" to *Sautter v. Interstate Power Co.*, 563 N.W.2d 609 (Iowa 1997), in which the Iowa Supreme Court rejected application of the "savings" statute to reinstate an untimely lawsuit where the previous incarnation of the lawsuit had been dismissed from federal court owing to an obvious lack of diversity jurisdiction. At oral arguments, both sets of defendants asserted that the real basis for "negligence" of counsel was the failure to file parallel actions in both state and federal court when the Original Complaint was filed—a course Doe has adopted this time around. The defendants argue that this obvious course would have protected the viability of the causes of action in state court if jurisdiction over the federal action was found wanting, and failure to pursue this course was therefore negligent. The Church Defendants contended further that Doe conceded there was no VAWA claim against them, so that federal jurisdiction over them hung from the tenuous thread of supplemental jurisdiction tied to a questionable federal claim against another defendant.

Doe's response is that she has plainly met the requirements of the "savings" statute and that it is a mischaracterization to describe Doe's counsel's conduct in as-

serting the VAWA claim as negligent when this court and the dissenting judge on the court of appeals both found that claim colorable. Doe also argues that *Sautter* is inapposite, because in this case there were no facts demonstrating the lack of subject matter jurisdiction that counsel should have discovered through reasonable diligence. She argues further that the claims against all of the defendants were so intertwined that pursuing separate suits against the Church Defendants in state court and against Hartz in federal court would have been inappropriate and inefficient, and she notes further that there was no motion by the Church Defendants in the original action to separate and remand the claims against them to state court.

### a. Iowa's "savings" statute

■ The "savings" statute in question, IOWA CODE § 614.10, provides as follows:

> If, after the commencement of an action, the plaintiff, for any causes except negligence in its prosecution, fails therein, and a new one is brought within six months thereafter, the second shall, for the purposes herein contemplated, be held a continuation of the first.

IOWA CODE § 614.10. Iowa courts have consistently recognized that there are four prerequisites to relief under this section to preserve an action that would otherwise be untimely on refiling: (1) the failure of the former action must not have been caused by the plaintiff's negligence; (2) a new action must have been commenced within six months after the failure of the former action; (3) the parties must be the same; and (4) the cause of action must be the same. *See Sautter v. Interstate Power Co.*, 563 N.W.2d 609, 611 (Iowa 1997); *Beilke v. Droz*, 316 N.W.2d 912, 913 (Iowa 1982); *Wetter v. Dubuque Aerie No. 568, Fraternal Order of Eagles*, 588 N.W.2d 130, 132 (Iowa Ct.App.1998); *Kane v. Iowa Dep't of Human Servs.*, 955 F.Supp. 1117, 1140 n. 15 (N.D.Iowa 1997).

■ As an initial matter, this court finds that nothing restricts application of the "savings" statute to refiling of an action in a federal court with proper jurisdiction after dismissal of a first action also brought in federal court. In *Beilke v. Droz*, 675 F.2d 194 (8th Cir.1982), the U.S. District Court for the Eastern District of Wisconsin had dismissed a lawsuit against an insurer on the ground that an insurer may not be sued directly under a Wisconsin statute. *Beilke*, 675 F.2d at 195. The suit was refiled in federal court in Iowa, and the court determined that IOWA CODE § 614.10 would permit the action to go forward if the insured and the insurer were the "same party" within the meaning of the statute. *Id.* The Eighth Circuit Court of Appeals certified to the Iowa Supreme Court the question of whether an insured and its insurance company were "the same" within the meaning of the statute. *Id.* The Iowa Supreme Court answered in the affirmative. *Id.* Thus, both the original and "saved" actions were filed in federal courts: one court without jurisdiction and one with. Although Doe has refiled the Present Complaint in the *same* federal court that entertained her Original Complaint, now asserting a different basis for federal jurisdiction—a basis for jurisdiction not available at the time her Original Complaint was filed—this court reads *Beilke* as supporting the conclusion that the "savings" statute would nonetheless be applicable to the refiled complaint *if* the requirements of the statute are met. In other words, the court in which the action is refiled is not a factor in determining the applicability of the "savings" statute.

### b. Applicability of the statute

■ *i. Negligence.* Here, the defendants assert that Doe fails to meet the first prerequisite for application of the "savings" statute, because dismissal of her first federal action was purportedly the result of her "negligence" in pursuing an

obviously insufficient federal claim. The plaintiff has the burden of pleading and proving his or her freedom from negligence in the prosecution of the first action. *Sautter,* 563 N.W.2d at 611; *Wetter,* 588 N.W.2d at 132 (citing *Sautter.*). As the Iowa Supreme Court has explained, " '[n]egligence in prosecution of an action is surely inherent when the plaintiff is lacking in diligence and so suffers a dismissal.' " *Id.* (quoting *Central Constr. Co. v. Klingensmith,* 256 Iowa 364, 369, 127 N.W.2d 654, 657 (1964)).

In *Sautter,* the plaintiffs asserted diversity of citizenship on the ground that they were citizens of Wisconsin, while the defendant was a citizen of Iowa. *Sautter,* 563 N.W.2d at 610. However, this assertion was "contrary to fact," because prior to filing the federal suit, the plaintiffs had moved from Wisconsin to Iowa, and after the suit was filed signed answers to interrogatories indicating that they were Iowa residents. *Id.* The plaintiffs' federal suit was subsequently dismissed for lack of diversity subject matter jurisdiction, and the plaintiffs then refiled their action in Iowa district court within six months. *Id.* The Iowa Supreme Court explained its reasons for denying the plaintiffs relief under the "savings" statute:

> The finding of negligence here was grounded, not on how aggressively the Sautters pressed their federal suit, but rather on how unreasonable it was for them to bring or pursue it without a factual basis for its most elementary requirement [diversity jurisdiction]. We think the finding was appropriate. The Sautters cannot show they were reasonably unaware of the diversity problem.

*Sautter,* 563 N.W.2d at 611. The court noted that "[a]ny attorney bringing a private tort suit in federal court necessarily starts with a careful consideration of diversity," and, although "[d]omicile and thus citizenship of an individual at the time a lawsuit is filed is not always easy to determine, ... the Sautters failed to establish they were not negligent by prosecuting the case in federal court." *Id.* Specifically, "[b]ringing and pressing the federal suit in the face of facts that would deprive that court of diversity jurisdiction denies the Sautters the relief accorded by Iowa Code section 614.10." *Id.* Thus, the result in *Sautter* depended on the plaintiffs' assertion of diversity jurisdiction in their first suit when that assertion was contrary to obvious facts.

In *Wetter v. Dubuque Aerie No. 568, Fraternal Order of Eagles,* 588 N.W.2d 130 (Iowa Ct.App.1998), although the plaintiff was also dismissed from federal court over a mistake of fact, the Iowa Court of Appeals distinguished between the negligence in *Sautter* and failure of a federal cause of action through no fault of the plaintiff:

> Although this case, like *Sautter,* involves dismissal of a federal case for lack of subject matter jurisdiction, we do not believe the record supports a similar finding that Wetter's federal case failed by reason of negligence in its prosecution. In *Sautter,* the plaintiff filed a claim in federal court despite implicit knowledge and express acknowledgement of the ultimate facts determinative of federal subject matter jurisdiction (e.g., no diversity of citizenship). Here, while Wetter may have approximated the number of Eagle employees, this ultimate and determinative jurisdictional fact was implicitly and peculiarly known only to the Eagles. There is no evidence Wetter was less than diligent in the investigation of her claim. Moreover, the Eagles' motion to dismiss Wetter's federal case and the resulting ruling were filed before Wetter could consider appropriate discovery to properly resolve this issue. The fact that Wetter's approximation of the number of Eagles' employees was later shown in the course of litigation to be incorrect does not, without more,

amount to negligence in prosecution of her federal claim.

*Wetter*, 588 N.W.2d at 132. Both *Sautter* and *Wetter* thus involved errors of fact, but only one of the two cases resulted in denial of relief under IOWA CODE § 614.10, because in only one of those cases was the error owing to a lack of diligence on the part of plaintiff's counsel. *See Wetter*, 588 N.W.2d at 131 (finding counsel was diligent, although mistaken about the number of defendant's employees upon which federal jurisdiction turned).

■ However disparaging defendants' characterization of Doe's VAWA claim may be, the fact remains that the adequacy of the claim—and hence the adequacy of Doe's assertion of federal question jurisdiction in the first action—turned on close questions of statutory interpretation, or at a minimum, on a complex interaction of law and fact. *See Doe*, 134 F.3d at 1342–44. As Doe points out, the questions were sufficiently close that, not only did this court initially reach a conclusion contrary to that of the court of appeals, but the appellate panel itself split on the questions presented. *See id.* at 1344–45 (Fagg, J., dissenting). No obvious factual inadequacy plagued the assertion of federal jurisdiction in Doe's Original Complaint. *Compare Sautter*, 563 N.W.2d at 611. The fact that Doe's assertion of a VAWA claim was later shown in the course of litigation to be incorrect does not, without more, amount to negligence in prosecution of her federal claim. *Cf. Wetter*, 588 N.W.2d at 132. Certainly, this court cannot find that Doe was "so lacking in diligence" that her prosecution of the Original Complaint in federal court on the basis of federal question jurisdiction amounted to "negligence." *Sautter*, 563 N.W.2d at 611.

Nor is the court persuaded that there is "more" in the form of failure to file the Original Complaint in parallel actions in state and federal court. First, the state-law claims as pleaded against all defendants "are so related to claims in the action within [the] original jurisdiction [of the federal court] that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. Thus, it was more than reasonable for Doe's counsel to rely on supplemental jurisdiction over her claims against the Church Defendants and her state-law claims against Hartz if she had a viable federal VAWA claim against Hartz. Furthermore, although it might have been prudent for Doe to file parallel actions originally, hindsight is 20/20. It is simply bad policy—that is, it is inefficient and potentially wasteful of the limited resources of both the state and federal courts and of the parties—to require a plaintiff to file parallel lawsuits in both fora any time federal jurisdiction depends upon a remotely novel federal claim, close questions of statutory interpretation, or facts not fully within the knowledge of the plaintiff. Again, the failure to plead parallel suits in two jurisdictions in order to preserve jurisdiction in at least one forum does not, at least in the circumstances of this case, amount to conduct "so lacking in diligence" that Doe's prosecution of the Original Complaint solely in federal court on the basis of federal question jurisdiction amounted to "negligence." *Sautter*, 563 N.W.2d at 611.

***ii. Other prerequisites.*** The court finds that Doe has met the other prerequisites for application of the "savings" statute to the Present Complaint, at least in most respects. Specifically, the Present Complaint was brought within six months, indeed, within about two months, after the dismissal of her Original Complaint; the parties are the same; and, apart from the *absence* of the VAWA claim (Count 1 of the Original Complaint), and *restriction* of the negligent supervision claim as compared to its original incarnation (Count 10 of the Original Complaint, as compared to

Count IX of the Present Complaint), and one other change deserving of more discussion, the causes of action are the same. *See Sautter*, 563 N.W.2d at 611 (stating these prerequisites to application of the "savings" statute).

■ **iii. The same cause of action.** That "one other change" is the change in the "tortious infliction of severe emotional distress" claim, which is Count VI of the Present Complaint. In the Original Complaint, the comparable claim—Count 7—was asserted *only* against defendant Hartz. *See* Original Complaint, Count 7; *see also Doe*, 970 F.Supp. at 1382. The allegations of outrageous conduct by defendant Hartz are the same in the Present Complaint as in the Original Complaint, *compare* Present Complaint, ¶ 60; *with* Original Complaint, ¶ 70, but there are also in the Present Complaint allegations of outrageous conduct by defendants Soens and the Diocese, *see* Present Complaint, ¶¶ 61–62, for which there are no comparable allegations in the Original Complaint. Similarly, whereas the comparable count of the Original Complaint alleged only the intent, willfulness, and recklessness of defendant Hartz, alleged his causation of Doe's damages, and prayed for relief only against him, *see* Original Complaint, ¶¶ 72–75 & prayer to Count 7, the Present Complaint alleges the intent, willfulness, and recklessness of "Defendants," alleges their causation of Doe's damages for tortious infliction of emotional distress, and prays for relief against all three of them. *See* Present Complaint, ¶¶ 64–67 & prayer to Count VI.

Thus, to the extent the "tortious infliction of severe emotional distress claim" is now leveled at defendants Soens and the Diocese, it is an entirely new cause of action not asserted in the original action, rather than "the same cause of action" as required for application of the "savings" statute, IOWA CODE § 614.10. *See Sautter*, 563 N.W.2d at 611 (the fourth prerequisite

to application of § 614.10 is that in the refiled action, "[t]he cause of action must be the same"). Consequently, this "new" cause of action is not timely filed within the applicable two-year statute of limitations, *see* IOWA CODE § 614.1(2), and is not "saved." IOWA CODE § 614.10.

Therefore, although defendants' motions to dismiss for untimeliness will otherwise be denied, that part of the Church Defendants' motion seeking to dismiss as untimely Count VI as to defendants Soens and the Diocese will be granted.

### 3. Failure to sue in plaintiff's proper name

As their final assertion of a procedural bar to the Present Complaint, the defendants contend that this case does not present one of the very rare exceptions to the rule that suing under a pseudonym is not allowed. This is not, they contend, a case involving a plaintiff's challenge to governmental activity, or a case in which the plaintiff might be compelled to admit an intention to engage in illegal conduct, thereby risking criminal prosecution. Although sexual assault is alleged, the defendants assert that there is certainly nothing constituting information of the "utmost intimacy" involved. They also point out that this case has a long history, including published decisions by both this court and the court of appeals detailing the factual allegations, that the plaintiff is not a minor, and that there can be little concern about possible harassment of the plaintiff as a result of the lawsuit, because the plaintiff is now living in Illinois, far from the locus of the events at issue. Finally, they argue that it is improper for Doe to pursue this lawsuit anonymously while subjecting the defendants to the embarrassment her allegations necessarily entail. They contend that if Doe will not amend her petition to assert her claims in her proper name, the action should be dismissed, citing *Doe v. Frank*, 951 F.2d 320, 322 (11th Cir.1992).

Doe's rejoinder is that it is for the court to determine, in its discretion, whether it is appropriate to allow the plaintiff to pursue a lawsuit under a fictitious name, and that the circumstances for permitting such prosecution are not as limited as defendants suggest. She contends that the proper test is whether she has a substantial privacy right that outweighs the customary and constitutionally-embedded presumption that judicial proceedings should be open. She asserts that the need for privacy here is apparent, because of the private nature of a person's religious convictions, and because of a serious possibility that she will be ostracized (or worse) for attacking conduct of religious figures. However, she also contends that if the court deems it inappropriate for her to pursue this litigation under a pseudonym, she should be given a period of time to amend her complaint, rather than the court dismissing the complaint outright.

### a. Pertinent factors

Rule 10(a) of the Federal Rules of Civil Procedure requires that the complaint in a lawsuit state the title of the action, which "shall include the names of all the parties." Several courts have opined that "[t]he intention of Rule 10 is to 'apprise the parties of the opponents and to protect the public's legitimate interest in knowing all the

facts and events surrounding court proceedings.'" *Doe v. Hallock,* 119 F.R.D. 640, 643 n. 1 (S.D.Miss.1987) (quoting *Free Market Compensation v. Commodity Exchange, Inc.,* 98 F.R.D. 311, 312 (S.D.N.Y. 1983)); *accord Free Speech v. Reno,* 1999 WL 47310, *1 (S.D.N.Y. Feb. 1, 1999); *Doe v. Shakur,* 164 F.R.D. 359, 360 (S.D.N.Y. 1996). As this court explained in *Heather K. v. City of Mallard, Iowa,* 887 F.Supp. 1249 (N.D.Iowa 1995), "Although the Federal Rules of Civil Procedure do not expressly prohibit use of pseudonyms for purposes of litigation, courts have recognized that 'lawsuits are public events and the public has a legitimate interest in knowing the facts involved in them. Among those facts is the identity of the parties.'" *Heather K.,* 887 F.Supp. at 1255 (quoting *Doe v. Deschamps,* 64 F.R.D. 652, 653 (D.Mont.1974)); *accord Doe v. Indiana Black Expo, Inc.,* 923 F.Supp. 137, 139 (S.D.Ind.1996).[2]

■ However, courts "have increasingly recognized an exception to this requirement in limited 'matters of a sensitive and highly personal nature.'" *Id.* (quoting *Deschamps,* 64 F.R.D. at 653); *accord Luckett v. Beaudet,* 21 F.Supp.2d 1029, 1029 (D.Minn.1998) ("Rule 10(a) notwithstanding, plaintiff claims her case fits within a limited realm of cases in which other inter-

2. Judge Hamilton of the United States District Court for the Southern District of Indiana reads the Federal Rules of Civil Procedure to provide a general ban on prosecuting lawsuits under fictitious names and has explained in more detail the public interest behind such a general prohibition:

Rule 10 of the Federal Rules of Civil Procedure provides that the title of the action in the complaint "shall include the names of all the parties...." Federal Rule of Civil Procedure 17 requires that all civil actions be prosecuted in the name of the real party in interest. These requirements are not a matter of mere administrative convenience for court staff and counsel. They also protect the public's legitimate interest in knowing which disputes involving which parties

are before the federal courts that are supported with tax payments and that exist ultimately to serve the American public. *See Doe v. Frank,* 951 F.2d 320, 324 (11th Cir.1992) ("Lawsuits are public events."); *Doe v. Rostker,* 89 F.R.D. 158, 160 (N.D.Cal. 1981) (Rule 10(a) protects "public's legitimate interest in knowing all the facts and events surrounding court proceedings."); *Doe v. Deschamps,* 64 F.R.D. 652, 653 (D.Mont.1974). *See generally Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 580 & n. 17, 100 S.Ct. 2814, 2829 & n. 17, 65 L.Ed.2d 973 (1980) (holding public has First Amendment right to attend criminal trial, but not deciding right to attend civil trials).

*Indiana Black Expo, Inc.,* 923 F.Supp. at 139.

ests—i.e., privacy and concern about embarrassment—outweigh the public's interest in open trials."). This exception does not swallow the rule, because "the fact that [the litigant] may suffer some personal embarrassment, standing alone, does not require the granting of his request to proceed under a pseudonym." *Frank*, 951 F.2d at 324.

■ The decision whether or not to allow the use of pseudonyms based on a need for anonymity in a particular lawsuit is left to the discretion of the court. *Heather K.*, 887 F.Supp. at 1255 (citing, *inter alia, James v. Jacobson*, 6 F.3d 233, 235 (4th Cir.1993), and *Frank*, 951 F.2d at 323). Unfortunately, there is still no express standard to guide courts in exercising such discretion, because neither the Eighth Circuit Court of Appeals nor the United States Supreme Court has yet provided instruction on this issue, although both have permitted prosecution of suits under pseudonyms. *Compare id.* (noting the lack of such guidance and citing Supreme Court and Eighth Circuit cases permitting use of pseudonyms).

■ In *Heather K.*, this court looked for guidance to a decision of the Eleventh Circuit Court of Appeals:

In *Doe v. Frank*, 951 F.2d 320 ([11th Cir.] 1992), the plaintiff sought to proceed under a fictitious name to avoid social stigma that he argued would attach upon revelation of his alcoholism. The Eleventh Circuit concluded that a plaintiff may proceed anonymously in "exceptional cases," where he "has a substantial privacy right which outweighs the 'customary and constitutionally-embedded presumption of openness in judicial proceedings.'" *Id.* at 323 (quoting *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir.1981)). The court identified three circumstances common to those cases where a plaintiff was permitted to proceed under a fictitious name. Those circumstances were:

(1) plaintiffs challenging governmental activity;

(2) plaintiffs required to disclose information of the utmost intimacy; and

(3) plaintiffs compelled to admit their intention to engage in illegal conduct, thereby risking criminal prosecution.

*Frank*, 951 F.2d at 323 (citing *Stegall*, 653 F.2d at 185). The factors enumerated in *Frank* and *Stegall* were not intended as a "rigid, three-step test for the propriety of party anonymity.'" *Id.* (quoting *Stegall*, 653 F.2d at 185). The mere presence of one factor was not meant to be dispositive, but rather, these factors were "highlighted merely as factors deserving consideration." *Id.* Instead, a court must "carefully review all the circumstances of a given case and then decide whether the customary practice of disclosing the plaintiffs identity should yield to the plaintiff's privacy concerns." *Id.; see also [Methodist Univ. Ass'n of Women Law Students v.] Wynne & Jaffe*, 599 F.2d [707,] 713 [(5th Cir.1979)].

*Heather K.*, 887 F.Supp. at 1255–56; *accord Luckett*, 21 F.Supp.2d at 1029 ("Although the listed factors [from *Frank* and *Stegall*] are not exhaustive, they provide valuable guidance.").

■ Some recent decisions have added to the three pertinent considerations suggested in *Frank* and *Stegall*. These decisions suggest consideration of (4) whether the plaintiff would risk injury if identified; (5) whether the party defending against a suit brought under a pseudonym would thereby be prejudiced, *see Free Speech*, 1999 WL 47310 at *2 (citing *Shakur*, 164 F.R.D. at 360, as considering these factors in addition to the three cited in *Frank*); (6) the extent to which the identity of the litigant has been kept confidential; (7) whether, because of the purely legal na-

ture of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigants' identities, *see id.* (citing *Doe v. Provident Life and Acc. Ins. Co.,* 176 F.R.D. 464, 467 (E.D.Pa.1997), for these last two factors); and (8) whether the interests of children are at stake. *Indiana Black Expo, Inc.,* 923 F.Supp. at 139. The ultimate test, however, remains "whether the plaintiff has a substantial privacy right which outweighs the 'customary and constitutionally-embedded presumption of openness in judicial proceedings.'" *See Frank,* 951 F.2d at 323; *accord Heather K.,* 887 F.Supp. at 1256 (quoting *Frank* ); *Free Speech,* 1999 WL 47310 at *2 (also quoting *Frank* ); *Indiana Black Expo, Inc.,* 923 F.Supp. at 139 (also quoting *Frank* ).

### b. Application of the factors

■ Of the three *Frank* factors, Doe's claims would seem to fall, if anywhere, within the "utmost intimacy" category. *See Frank,* 951 F.2d at 323. The defendants are correct, however, that the "sexual" nature of the alleged wrongdoing here is not necessarily sufficient to warrant Doe's prosecution of this lawsuit under a pseudonym. For example, in *Luckett,* the court concluded that, "[t]hough discussing alleged sexual coercion and discrimination is undoubtedly uncomfortable, it is not such an invasion of privacy as to justify reducing the normal publicity of judicial proceedings." *Luckett,* 21 F.Supp.2d at 1030. A more thorough analysis was presented in *Shakur,* in which the court wrote, "The present case is a difficult one. If the allegations of the complaint are true, plaintiff was the victim of a brutal sexual assault. Quite understandably, she does not want to be publicly identified and she has very legitimate privacy concerns." *Shakur,* 164 F.R.D. at 361. The court nonetheless concluded that, "[o]n balance," these concerns were "outweighed" by several considerations: (1) "the plaintiff has

chosen to bring this lawsuit [and][f]airness requires that she be prepared to stand behind her charges publicly"; (2) "this is a civil suit for damages, where plaintiff is seeking to vindicate primarily her own interests"; (3) the defendant "has been publicly accused"; and (4) "the public has a right of access to the courts." *Id.*

In this case, the alleged sexual assault, although doubtless very offensive to Doe, could not be considered "brutal." *Cf. id.* However, that is not the end of the inquiry, because other factors must also be considered. The court acknowledges that the plaintiff's concern that she risks injury if identified is not wholly unrealistic. *See Free Speech,* 1999 WL 47310 at *2 (also considering this factor); *Shakur,* 164 F.R.D. at 360 (same). This is so, because Doe alleges sexual misconduct by a Catholic priest and further misconduct by that priest's superiors that purportedly allowed the priest's misconduct to happen. Although Doe elsewhere contends that her claims can and should be resolved according to neutral principles of law that have nothing to do with religious doctrine or practice, it is nonetheless apparent that *any* attack or perceived attack upon figures of any religious denomination may be greeted with hostility by certain adherents of that religion. Although those persons potentially offended by Doe's lawsuit are certainly not restricted to Iowa, the court's immediate concerns about protecting Doe's anonymity are considerably lessened by the fact that Doe has now left the St. Lawrence Church, and indeed is no longer a resident of Iowa. The potential harm to Doe here is too speculative to justify maintaining her anonymity. Thus, this factor ultimately does not weigh in favor of anonymity.

Other factors here are simply equivocal. The defendants have not articulated how defending against a suit brought under a pseudonym would prejudice their defense of the suit. *See Free Speech,* 1999 WL

47310 at *2 (considering prejudice to the defending party); *Shakur*, 164 F.R.D. at 360 (same). Doe's use of a pseudonym in this litigation seems unlikely to provide any bar, for example, to the defendants' access to information necessary to defend the suit: The defendants are already intimately familiar not only with the incidents alleged but with the actual identity of the plaintiff. On a related matter, although the defendants point out that there are already two published decisions in this case, one from this court and one from the Eighth Circuit Court of Appeals, both of which recounted the alleged incidents, their timing, and location, there is no suggestion that the identity of the litigant has not in fact been kept confidential. *See id.* (citing *Provident Life and Acc. Ins. Co.*, 176 F.R.D. at 467, for this factor).

However, there is considerable appeal to the defendants' argument that they should not be held up to public ridicule while their accuser remains anonymous, when it is their accuser who has focused public attention on the circumstances she finds embarrassing. *See Shakur*, 164 F.R.D. at 361 (concluding that, "[o]n balance," plaintiff's concerns were "outweighed" by several considerations, including the fact that "the plaintiff has chosen to bring this lawsuit [and][f]airness requires that she be prepared to stand behind her charges publicly," as well as the fact that the defendant "ha[d] been publicly accused"). The court considers it appropriate here to weigh the speculative nature of the potential harm to Doe from revealing her identity against the very real embarrassment her accusations have already caused the defendants. Furthermore, the accuser here is an adult, so that the interests of a child victim are not at stake. *Indiana Black Expo, Inc.*, 923 F.Supp. at 139; *Heather K.*, 887 F.Supp. at 1255–56.

Finally, this is certainly not a case in which, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigants' identities. *See Free Speech*, 1999 WL 47310 at *2 (citing *Doe v. Provident Life and Acc. Ins. Co.*, 176 F.R.D. at 467). To the contrary, this is a case in which public interest in the accuracy of the factual allegations and the potential for liability of the various defendants may be of particular interest, both because of the potential that the plaintiff's claims may be vindicated, and because spurious allegations against religious figures may be exposed.

Therefore, upon consideration of pertinent factors, and acknowledging that the circumstances may be close to the line, the court concludes that prosecution of this litigation under a pseudonym is not appropriate, because Doe does not have "a substantial privacy right that outweighs the 'customary and constitutionally-embedded presumption of openness in judicial proceedings.'" *See Frank*, 951 F.2d at 323; *accord Heather K.*, 887 F.Supp. at 1256. Rather, this is a case in which pleading in the plaintiff's proper name should be required to vindicate the purpose of Rule 10(a) "to 'apprise the parties of their opponents and to protect the public's legitimate interest in knowing all the facts and events surrounding court proceedings.'" *Hallock*, 119 F.R.D. at 643 n. 1; *accord Free Speech*, 1999 WL 47310 at *1; *Shakur*, 164 F.R.D. at 360; *Indiana Black Expo, Inc.*, 923 F.Supp. at 139; *Heather K.*, 887 F.Supp. at 1255.

Having so concluded, however, the court does not find that this matter should be dismissed. Rather, the defendants' motions to dismiss for failure to sue in the plaintiff's proper name will be granted to the extent that Doe must amend her complaint to sue in her proper name. Only if she refuses to do so will dismissal be appropriate.

## B. Substantive Challenges

In addition to the various procedural bars addressed above, defendants challenge each and every one of Doe's twelve claims as failing to state a claim upon which relief can be granted. Doe has resisted these challenges, asserting the viability of her claims as pleaded. The court will consider the claims *seriatim*. However, first the court must articulate the standards against which Doe's attempts to state her various claims must be measured.

### 1. Standards for a Rule 12(b)(6) dismissal

The issue on a motion to dismiss for failure to state a claim pursuant to FED. R.CIV.P. 12(b)(6) is not whether a plaintiff will ultimately prevail, but rather whether the plaintiff is entitled to offer evidence in support of his or her claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1376 (8th Cir.1989). In considering a motion to dismiss under Rule 12(b)(6), the court must assume that all facts alleged in the plaintiff's complaint are true, and must liberally construe those allegations. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515, 518 (8th Cir.1999) ("We take the well-pleaded allegations in the complaint as true and view the complaint, and all reasonable inferences arising therefrom, in the light most favorable to the plaintiff."); *Gordon v. Hansen*, 168 F.3d 1109, 1113 (8th Cir.1999) (same); *Midwestern Machinery, Inc. v. Northwest Airlines*, 167 F.3d 439, 441 (8th Cir.1999) (same); *Wisdom v. First Midwest Bank*, 167 F.3d 402, 405 (8th Cir. 1999) (same); *Duffy v. Landberg*, 133 F.3d 1120, 1122 (8th Cir.) (same), *cert. denied,* —— U.S. ——, 119 S.Ct. 62, 142 L.Ed.2d 49 (1998); *Doe v. Norwest Bank Minn., N.A.*, 107 F.3d 1297, 1303–04 (8th Cir.1997) (same); *WMX Techs., Inc. v. Gasconade County, Mo.*, 105 F.3d 1195, 1198 (8th Cir.1997) (same); *First Commercial Trust v. Colt's Mfg. Co.*, 77 F.3d 1081, 1083 (8th Cir.1996) (same).

The United States Supreme Court and the Eighth Circuit Court of Appeals have both observed that "a court should grant the motion and dismiss the action 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir.1997) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *accord Conley*, 355 U.S. at 45–46, 78 S.Ct. 99 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief."); *Meyer*, 178 F.3d at 518 ("The question before the district court, and this court on appeal, is whether the plaintiff can prove any set of facts which would entitle the plaintiff to relief" and "[t]he complaint should be dismissed 'only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations,'" quoting *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir.1995)); *Gordon*, 168 F.3d at 1113 ("We will not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts that would demonstrate an entitlement to relief."); *Midwestern Machinery, Inc.*, 167 F.3d at 441 (same); *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir.1998) (same); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir.1997) (same); *Doe*, 107 F.3d at 1304 (same); *WMX Techs., Inc.*, 105 F.3d at 1198 (same). The Rule does not countenance dismissals based on a judge's disbelief of a complaint's factual

allegations. *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). Thus, "[a] motion to dismiss should be granted· as a practical· matter only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey v. City ·of Herculaneum,* 44 F.3d 667, 671 (8th ·Cir. 1995) (internal quotation marks and ellipses omitted); *accord Parnes,* 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim). The court now turns to the question of whether some "insuperable bar" is raised against Doe's claims.

### 2. *Sexual abuse*

Count I of the Present Complaint alleges "sexual abuse" by defendant Hartz. Once again, the· allegations of this count are *verbatim* repetitions of the allegations of the comparable count in the Original Complaint. *Compare* Present Complaint, Count I; *with* Original Complaint, Count 2. Doe alleges in this count that defendant Hartz "fondled and kissed the Plaintiff for the purpose of arousing and/or satisfying his sexual desires. Defendant Hartz again fondled Plaintiff following the mass." Present Complaint, ¶ 30. More specifically, the "fondling and kissing" alleged consisted of the following: defendant Hartz "came up behind [Doe], grabbed her with both of his hands and pulled her back into his body, held her tightly and kissed her neck" and later that same evening, after mass, "Defendant Hartz rubbed Plaintiff's back up and down with his hand." *Id.* at ¶¶ 12 & 15. As in the Original Complaint, the relief Doe seeks on this claim in the Present Complaint includes compensatory and punitive damages, as well as a judgment "requiring Defendant Hartz to receive professional counseling within the meaning of Iowa Code § 611.23." *See* Present Complaint, prayer to Count I; *and*

*compare* Original Complaint, prayer to Count 2.

Hartz has moved to dismiss this claim pursuant to· FED.R.CIV.P. .12(b)(6) on the ground that the alleged circumstances do· not constitute "sexual abuse" as defined by IOWA CODE § 709.1(1), because there is no allegation of a "sex act" as defined by IOWA CODE § 702.17. Doe responds that she has adequately alleged "sexual exploitation" by a "counselor or therapist" within the meaning. of IOWA CODE § 709.15, asserting that the acts alleged fit within the definition of "sexual exploitation" found in IOWA CODE § 709.15(1)(f)(3), while Father Hartz, as a priest, falls within the statutory definition of a "counselor or therapist" by virtue of his role in the church.

#### · a. *"Sexual abuse" within the meaning of § 709.1*

██ Defendant Hartz is correct that Doe's allegations fall short of alleging "sexual abuse" within the meaning of IOWA CODE § 709.1. That code provision provides, in pertinent part, that "[a]ny sex act between persons is sexual abuse by either of the participants when the act is performed with the other participant ... by force or against the will. of the other." IOWA CODE § 709.1. A "sex act" is in turn defined in IOWA CODE § 702.17 as follows:

> The term "sex act" or "sexual activity" means any sexual contact between two or more persons by: penetration of the penis into the vagina or anus; contact between the mouth and genitalia or by contact between the genitalia of one person and the genitalia or anus of another person; contact· between the finger or hand of one person and the genitalia or anus of another person, except in the course of examination or treatment by a person licensed pursuant to chapter 148, 148C, 150, 150A, 151, or 152; or by use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus. ·

IOWA CODE § 702.17. Doe alleges only "fondling," none of which involved contact with genitalia, and "kissing" on the back of her neck. *See* Present Complaint, ¶¶ 12, 15, and 30. These allegations do not allege a "sex act" within the meaning of IOWA CODE § 702.17.

The absence of allegations of a "sex act" within the meaning of IOWA CODE § 702.17 is an "insuperable bar" to Doe's claim for "sexual abuse" premised on a violation of IOWA CODE § 709.1. *See Frey*, 44 F.3d at 671 ("A motion to dismiss should be granted as a practical matter only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.") (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim). At a minimum, this conclusion forecloses part of the relief Doe sought, *see id.*, a judgment "requiring Defendant Hartz to receive professional counseling within the meaning of Iowa Code § 611.23." *See* Present Complaint, prayer to Count I. Such relief is only available under IOWA CODE § 611.23 "[i]n a civil action in which a plaintiff is seeking relief or damages for alleged sexual abuse as defined in section 709.1," IOWA CODE § 623.11, and Doe cannot pursue such an action.

### b. "Sxual exploitation" within the meaning of § 709.15

 In her resistance to defendant Hartz's motion to dismiss this count, Doe relied on "sexual exploitation by a counselor or therapist" within the meaning of IOWA CODE § 709.15, instead of upon "sexual abuse" within the meaning of IOWA CODE § 709.1. Doe's allegations of "kissing" and "fondling" by Hartz are sufficient to come within the meaning of "sexual exploitation" in this code section, because § 709.15 defines "sexual exploitation" as "[a]ny sexual conduct ... which includes but is not limited to the following: kissing; touching of the clothed or unclothed inner thigh,

breast, groin, buttock, anus, pubes, or genitals; or a sex act as defined in section 702.17." IOWA CODE § 709.15(f)(3); *and compare* Present Complaint, ¶¶ 12, 15, and 30 (alleging "fondling" and "kissing"). However, the court concludes that Doe's claim of "sexual exploitation" is nonetheless untenable.

The Eighth Circuit Court of Appeals concluded that, in her Original Complaint, Doe had failed to allege an offense of sexual exploitation by a counselor or therapist within the meaning of IOWA CODE § 709.15—as a predicate offense to her VAWA claim—even though Doe had alleged that Hartz "served as a counselor to [her]." *See Doe*, 134 F.3d at 1342. The Eighth Circuit Court of Appeals found that Doe had failed to allege that Hartz was Doe's "counselor or therapist" within the meaning of the Iowa statute, because "[n]othing in the complaint alleges that Doe received 'mental health services' from Father Hartz, yet this is a requisite element of the Iowa Code's definition of 'counselor or therapist.'" *Id.* (citing IOWA CODE § 709.15(1)(a)). This was so, the court reasoned, because "[t]o adequately plead that she received mental health services, Doe was required to assert factual allegations that she received 'treatment, assessment, or counseling' for a 'dysfunction,'" but no services for any sort of dysfunction had been alleged. *Id.* (quoting IOWA CODE § 709.15(1)(d)). In the Present Complaint, Doe does not even allege that Hartz "served as a counselor to [her]"— that allegation was found in the Original Complaint in the VAWA count, which is now absent from the Present Complaint— let alone that Hartz was providing "services" to her for any "dysfunction." *Cf. id.* Thus, in the Present Complaint, Doe has failed to allege sexual exploitation by a counselor or therapist within the meaning of IOWA CODE § 709.15 as the pertinent statute has been interpreted by the Eighth Circuit Court of Appeals. This failure is

an "insuperable bar" to relief on a claim premised on "sexual exploitation." *See Parnes,* 122 F.3d at 546; *Frey,* 44 F.3d at 671.

### c. Assault and battery

 Although the claim in Count I has not been denominated as such—indeed, it was not denominated as a claim for "sexual exploitation," either—Doe's factual allegations and the specific allegations in Count I of the Present Complaint do state a civil claim for simple assault or battery. "It is ... elementary that one upon whom an unjustified assault is made has a civil cause of action for damages against the person making the assault." *In re Cuykendall's Estate,* 223 Iowa 526, ——, 273 N.W. 117, 119 (1937). As this statement suggests, Iowa courts have sometimes looked to the criminal code's definition of assault as defining the elements of assault in civil actions for damages or other relief. *See id.; see also Bacon v. Bacon,* 567 N.W.2d 414, 417 (Iowa 1997) (in an action for relief from domestic abuse under Iowa Code Ch. 232, domestic abuse under Iowa Code § 236.2 is defined as assault within the meaning of Iowa Code § 708.1). Although "[a]ssault can be committed in several ways," *Bacon,* 567 N.W.2d at 417, the pertinent definitions here, as in *Bacon,* are as follows:

> A person commits an assault when, without justification, the person does any of the following:
>
> (1) Any act which is intended to cause pain or injury to, or which is intended to result in physical contact which will be insulting or offensive to another, coupled with the apparent ability to execute the act.
>
> (2) Any act which is intended to place another in fear of immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act.

Iowa Code § 708.1(1) & (2); *accord Bacon,* 567 N.W.2d at 417. These elements are comparable to the elements of the tort of assault as defined by the Restatement (Second) of Torts:

> § 21. Assault
>
> (1) An actor is subject to liability to another for assault if
>
>> (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and
>>
>> (b) the other is thereby put in such imminent apprehension.

Restatement (Second) of Torts § 21; *see Greenland v. Fairtron Corp.,* 500 N.W.2d 36, 38 & n. 4 (Iowa 1993) (looking to the Iowa Civil Jury Instructions and the Restatement (Second) of Torts for the elements of assault to determine whether a civil assault claim is preempted by the Iowa Civil Rights Act); Iowa Civil Jury Instructions Nos.1900.1 & 1900.2 (defining assault based on Restatement (Second) of Torts § 21, 31, 32). Thus, assault consists of " 'acts threatening violence [or offense] to the person of another; coupled with the means, ability, and intent to commit the violence [or offense] threatened.' " *Schneider v. Middleswart,* 457 N.W.2d 33, 35 (Iowa Ct.App.1990) (quoting *Holdorf v. Holdorf,* 185 Iowa 838, 841, 169 N.W. 737, 738 (1918)); *accord Bacon,* 567 N.W.2d at 417–18 (assault for the purposes of a civil action for domestic abuse consists of the "intent" element and "the apparent ability to execute the act" element). The focus is on the offender's intent, not the victim's expectations. *Bacon,* 567 N.W.2d at 418.

Here, Doe has alleged that Father Hartz did an act "intended to result in physical contact which will be insulting or offensive to [her]," Iowa Code § 708.2(1); Restatement (Second) of Torts § 21(1)(a) (the offender commits the tort of assault when the offender "acts intending to cause a harmful or offensive contact with the

person of the other or a third person"), or "place[d] [her] in fear of immediate physical contact which [was] ... insulting, or offensive," IOWA CODE § 708.2(2); RESTATEMENT (SECOND) OF TORTS § 21(1)(1) (the offender.commits the tort of assault when the offender "acts intending to cause ... an imminent apprehension of [harmful or offensive] contact"), when Hartz allegedly "fondled and kissed the Plaintiff for the purpose of arousing and/or satisfying his sexual desires" and when he "again fondled Plaintiff following the mass." Present Complaint, ¶ 30.

 "It is elementary, of course, that it is not necessary, in order to establish an assault, to show that there was also a battery, or that the person assaulted suffered any particular bodily injury as the result of such assault." *In re Cuykendall's Estate*, 223 Iowa at ——, 273 N.W. at 119. However, Doe has also adequately alleged battery. The RESTATEMENT (SECOND) OF TORTS defines a "battery" as follows:

§ 13. Battery: Harmful contact

An actor is subject to liability to another for battery if

(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

(b) a harmful contact with the person or the other directly. or indirectly results.

RESTATEMENT (SECOND) OF TORTS § 13; *see* Iowa Civil Jury Instructions No.1900.3 & 1900.4 (relying on RESTATEMENT (SECOND) OF TORTS § 13 and 18); *accord Greenland*, 500 N.W.2d at 38 & n. 5 (looking to the Iowa Civil Jury Instructions and the RESTATEMENT (SECOND) OF TORTS for the ele-

ments of battery to determine whether a civil battery claim is preempted by the Iowa Civil Rights Act). Again, Doe has alleged that "offensive contact" directly resulted from Father Hartz's acts. RESTATEMENT (SECOND) OF TORTS § 13; *see* Present Complaint, ¶ 30.

 The fact that an assault or battery theory of the claim has not been expressly pleaded in Count I is not an "insuperable bar" to its assertion here.[3] Doe can prove a set of facts consistent with her allegations that would entitle her to relief for assault or battery. *See Conley*, 355 U.S. at 45–46, 78 S.Ct. 99; *Meyer*, 178 F.3d at 518; *Gordon*, 178 F.3d at 1113; *Midwestern Machinery, Inc.*, 167 F.3d at 441; *Springdale Educ. Ass'n*, 133 F.3d at 651; *Parnes*, 122. F.3d at 546; *Handeen*, 112 F.3d at 1347; *Doe*, 107 F.3d at 1304; *WMX Techs., Inc.*, 105 F.3d at 1198. More specifically, under the notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, "plaintiffs are not required to plead legal theories," and the court must ask "whether relief is possible under any set of facts that could be established consistent with the allegations." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 731 (7th Cir.1998); *Bennett v. Schmidt*, 153 F.3d 516, 518–19 (7th Cir. 1998) (noting that the difference between notice pleading and code pleading is that in notice pleading, as established by FED. R.CIV.P. 8, the plaintiff need not identify any "cause of action" or "legal theory," as long as the defendant receives notice of the conduct from which liability allegedly arises); *Nance v. Vieregge*, 147 F.3d 589, 590 (7th Cir.1998) ("Plaintiffs need not plead facts or legal theories; it is enough to set out a claim for relief."), *cert. denied*, —— U.S. ——, 119 S.Ct. 426, 142 L.Ed.2d 347 (1998); *Thrift v. Estate of*

---

3. Doe has asserted a claim denominated "assault," but in Count V, not Count I. The "assault" claim does not pertain to the conduct at issue in Count I, because it expressly alleges, "*After* Defendant Hartz sexually assaulted Plaintiff, he placed Plaintiff in fear of offensive physical contact." Present Complaint, Count V, ¶ 54 (emphasis added).

*Hubbard,* 44 F.3d 348, 356 (5th Cir.1995) ("Under the Federal Rules of Civil Procedure, a pleading ... need not specify in exact detail every possible theory of recovery—it must only ' "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests," ' " quoting *Conley,* 355 U.S. at 47, 78 S.Ct. 99); *see also Valona v. U.S. Parole Comm'n,* 165 F.3d 508, 510 (7th Cir.1998) (" 'Litigants need not plead legal theories, see *Bartholet v. Reishauer A.G. (Zurich),* 953 F.2d 1073 (7th Cir.1992), and district judges should afford the relief to which the prevailing party is entitled without regard to errors in the pleadings. *See* FED. R.CIV.P. 54(c).' ") (quoting the panel decision at 138 F.3d 693, 695 (7th Cir.1998)); *Massachusetts Bay Ins. Co. v. Vic Koenig Leasing,* 136 F.3d 1116, 1126 (7th Cir.1998) ("We need not limit ourselves to speculating on what *legal theories* Film House intended to allege in its complaint. Once again, it is the facts set forth therein that one must consider in determining whether" a claim is stated) (emphasis in the original). A theory of assault or battery is consistent with Doe's allegations, and Doe's pleadings provided Hartz with sufficient notice that she was asserting a claim for damages for offensive touching or threatened offensive touching. Thus, Doe has stated a claim in Count I upon which relief can be granted. *Compare* FED. R.CIV.P. 12(b)(6) (providing for dismissal of counts that fail to state a claim upon which relief can be granted).

To summarize the court's conclusions, Doe may not hereafter refer to her claim in Count I as "sexual abuse" or "sexual exploitation," but instead must identify it as "assault or battery"; Doe cannot obtain relief on this claim under IOWA CODE § 611.23, because she has not stated a claim for damages for violation of IOWA CODE § 709.1; however, defendant Hartz is not entitled to wholesale dismissal of this Count, because this Count adequately states a claim of assault or battery upon which relief can be granted. Hartz's motion to dismiss Count I will therefore be denied.

### 3. *Fraud*

The defendants next assert that Doe's fraud claim against them fails to state a claim upon which relief can be granted, and therefore must be dismissed pursuant to Rule 12(b)6. Doe's fraud claim is premised upon allegations that, "as a priest," defendant Hartz "could be trusted to not fondle and kiss Plaintiff in a sexual manner by holding himself out as celibate and as a personal fiduciary" and that he "could be trusted and respected as a representative of the church and of God." Present Complaint, ¶ 37. Doe also alleges that the other defendants knew about Hartz's misrepresentations, and "intended to deceive Plaintiff to save themselves, the church, and the congregation the embarrassment of admitting there was a priest in St. Lawrence Church that had a problem with sexual abuse," and these defendants "also intended to foster continued confidence in the institution." Present Complaint, ¶¶ 40–41. She alleges further her justifiable reliance on the defendants' misrepresentations, and that the falsity of the representations would not have been apparent to her "unless the truth were disclosed by the Defendants." *Id.* at ¶ 43.

The defendants contend that the mere fact that defendant Hartz is a priest is not enough to constitute a "representation" that he would not fondle and kiss the plaintiff or that he could be trusted and respected as a representative of the church and of God. Status alone, they contend, cannot be a representation upon which a fraud claim is based, and nowhere does Doe allege an overt statement. Furthermore, the Church Defendants argue that there is no implied representation of any kind alleged against them. Doe counters that fraud can arise from a concealment or

failure to disclose material facts. She argues that a duty to disclose arose here, because of the defendants' superior knowledge of defendant Hartz's background. Because Father Hartz held himself out as a priest and a celibate, Doe argues, knowing he had no intention or no ability to abide by the requirements of such a position, Hartz owed a duty to Doe in particular and to the congregation as a whole to apprise them of his sexual propensities. Doe contends that Hartz's failure to make such a revelation amounted to an affirmative misrepresentation, because of the obvious interest of parishioners in a priest's history of sexual misconduct.

### a. Elements and pleading

This court has articulated the elements of fraud under Iowa law and the standards for pleading fraud with the particularity required by FED.R.CIV.P. 9(b) in several recent decisions. *See Brown v. North Cent. F.S., Inc.,* 987 F.Supp. 1150, 1155–57 (N.D.Iowa 1997) (pleading); *Brown v. North Cent. F.S., Inc.,* 173 F.R.D. 658, 664–65 (N.D.Iowa 1997) (pleading); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812 (N.D.Iowa 1997) (elements); *North Cent. F.S., Inc. v. Brown,* 951 F.Supp. 1383, 1407–08 (N.D.Iowa 1996) (pleading); *Jones Distrib. Co. v. White Consol. Indus., Inc.,* 943 F.Supp. 1445, 1469 (N.D.Iowa 1996) (elements of fraud and fraudulent nondisclosure); *De Wit v. Firstar Corp.,* 879 F.Supp. 947, 970 (N.D.Iowa 1995) (elements and pleading). Thus, only a brief discussion of these matters is required here.

■■■■ Rule 9(b) of the Federal Rules of Civil Procedure " 'requires a plaintiff to allege with particularity the facts constituting the fraud.' " *See Brown,* 987 F.Supp. at 1155 (quoting *Independent Business Forms v. A–M Graphics,* 127 F.3d 698, 703 n. 2 (8th Cir.1997)). " 'When pleading fraud, a plaintiff cannot simply make conclusory allegations.' " *Id.* (quoting *Roberts*

*v. Francis,* 128 F.3d 647, 651 (8th Cir. 1997)).

■■■■■ The required elements of fraudulent misrepresentation under Iowa law are "(1) a material (2) false (3) representation coupled with (4) scienter and (5) intent to deceive, which the other party (6) relies upon with (7) resulting damages to the relying party." *See Tralon, Inc.,* 966 F.Supp. at 827 (internal quotations and citations omitted); *Jones Distrib. Co.,* 943 F.Supp. at 1469 (same elements); *accord In re Marriage of Cutler,* 588 N.W.2d 425, 430 (Iowa 1999) (same elements). Under Iowa law, " '[a] representation need not be an affirmative misstatement; the concealment of or failure to disclose a material fact can [also] constitute fraud.' " *Jones Distrib. Co.,* 943 F.Supp. at 1473 (quoting *Clark v. McDaniel,* 546 N.W.2d 590, 592 (Iowa 1996)); *accord Cutler,* 588 N.W.2d at 430; *Gouge v. McNamara,* 586 N.W.2d 710, 714 (Iowa Ct.App.1998). Thus, fraudulent concealment, upon which Doe specifically relies as the theory of her "fraud" claim, has the following elements:

1. Special circumstances existed which gave rise to a duty of disclosure between the plaintiff and the defendant. *(Describe the relationship found to give rise to a duty of disclosure.)*

2. While such relationship existed, the defendant [was aware of the following facts] [intended the following course of action] *(state the facts or intent alleged to have been withheld).*

3. While such relationship existed, the defendant concealed or failed to disclose [the knowledge or intent alleged to have been withheld].

4. The undisclosed information was material to the transaction.

5. The defendant knowingly failed to make the disclosure.

6. The defendant intended to deceive the plaintiff by withholding such information.

7. The plaintiff acted in reliance upon the defendant's failure to disclose and was justified in such reliance.

8. The failure to disclose was a proximate cause of the plaintiff's damage.

9. The nature and extent of the plaintiff's damage.

Iowa Civil Jury Instructions, 810.2; *see also Jones Distrib. Co.*, 943 F.Supp. at 1473; *Cutler*, 588 N.W.2d at 430 (defining the elements of fraud as including (1) misrepresentation or failure to disclose when under a legal duty to do so, (2) materiality, (3) scienter, (4) intent to deceive, (5) justifiable reliance, and (6) resulting injury or damage). The plaintiff must prove the elements of fraudulent misrepresentation or fraudulent concealment by clear and convincing evidence. *Cutler*, 588 N.W.2d at 430.

 As the Iowa Supreme Court has observed,

[F]or concealment to be actionable, the representation must "relate to a material matter known to the party ... which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition ·and knowledge, or other attendant circumstances." *Sinnard [v. Roach]*, 414 N.W.2d [100,] 105 [ (Iowa 1987) ] (quoting *Wilden Clinic, Inc. v. City of Des Moines*, 229 N.W.2d 286, 293 (Iowa 1975)).

*Clark*, 546 N.W.2d at 592; *McGough v. Gabus*, 526 N.W.2d 328, 331 (Iowa 1995) (fraud may arise from a special relationship giving rise to a duty to disclose and failure to make that disclosure). Iowa cases have not provided a specific test for determining when a duty to reveal arises in fraud cases. *See Clark*, 546 N.W.2d at 592 (citing *Sinnard*, 414 N.W.2d at 106);

*Arthur v. Brick*, 565 N.W.2d 623, 625 (Iowa Ct.App.1997).) However, Iowa courts have recognized that "[a] misrepresentation may occur when one with superior knowledge, dealing with inexperienced persons who rely on him or her, purposely suppresses the truth respecting a material fact in the transaction." *See Clark*, 546 N.W.2d at 592 (quoting *Kunkle Water & Elec., Inc. v. City of Prescott*, 347 N.W.2d 648, 653 (Iowa 1984);) *Arthur*, 565 N.W.2d at 625 (quoting *Clark* ); *see also Gouge*, 586 N.W.2d at 714 (quoting *Arthur* ).

### *b. Doe's allegations*

 As noted above, Doe asserts that the requisite legal duty to disclose arose from Hartz's status "as a priest" and all defendants' superior knowledge of Hartz's alleged propensity for and past history of sexual misconduct. However, although Doe has alleged the defendants' superior knowledge of material facts, this court perceives various difficulties with Doe's assertion of a "legal duty" to disclose in this case. First, the court has found no authority for the proposition that one's status alone constitutes a representation of conduct, or that one's status gives rise to a duty to disclose past incompatible conduct, and Doe has cited none. A case before the New Jersey Supreme Court is instructive: In *Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 432 A.2d 521 (1981), the court held that, "[b]ecause of the unique moral and spiritual relationship between clergy and congregation, revelation of [a rabbi's criminal conviction for mail fraud] surely would have adversely affected defendant's employment opportunity." *Whale*, 432 A.2d at 525. However, in that case, the rabbi had affirmatively represented that he had been employed by the Ministry of Education Foreign Student Department in Israel during the period he had actually been convicted of and served time for mail fraud in the United States. *Id.* at 522. Thus, it was not simply the rabbi's status as a rabbi that gave rise to a

duty to disclose his past criminal conduct to his congregation, but an affirmative misrepresentation about his employment history omitting pertinent information by the rabbi to the plaintiff congregation, as an employer, that "hindered plaintiff's opportunity to discover an episode in [the rabbi's] past that reflected unfavorably upon his moral integrity." *Id.* at 525.[4]

■ Furthermore, Iowa law appears to contemplate a tort claim for fraudulent concealment only where one with superior knowledge fails to disclose material facts *in the context of a specific transaction,* not simply when there is a non-disclosure of facts that may somehow relate to a person's status. *See, e.g., Clark,* 546 N.W.2d at 592 (in a case involving fraudulent concealment in the sale of a car, the court stated, "for concealment to be actionable, the representation must relate to a material matter known to the party ... which it is his legal duty to communicate *to the other contracting party* whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances," and "[a] misrepresentation may occur when one with superior knowledge, dealing with inexperienced persons who rely on him or her, purposely suppresses

the truth *respecting a material fact in the transaction* ") (emphasis added, citations and internal quotations omitted); *Arthur,* 565 N.W.2d at 624 (fraudulent concealment was actionable in a suit for rescission of a real estate contract); *Cornell v. Wunschel,* 408 N.W.2d 369, 374 (Iowa 1987) (fraudulent concealment was actionable in a suit by a lessee against the former owner of a hotel over concealment of facts concerning the profitability of the hotel). The court is unwilling to construe an on-going relationship between a priest and members of his congregation as a "transaction" giving rise to a general and all-encompassing duty to disclose any past misconduct unknown to the congregation to everyone at the commencement of or during the course of the relationship.

■ Although parishioners might want to know that a priest assigned to their church has a history of sexual misconduct—just as people in a neighborhood might want to know that their new next door neighbor is a convicted child molester—the court can find no duty under Iowa law for a priest to wear a "Scarlet Letter" disclosing his past misconduct, or any duty upon his superiors to make a disclosure of his past misconduct.[5] Lack of such a legal duty to disclose—the first element of Doe's

---

4. Although the defendants assert that *Schmidt v. Bishop,* 779 F.Supp. 321 (S.D.N.Y.1991), stands for the broad proposition that fraud claims based on sexual misconduct cannot be asserted against a member of the clergy, the court in that case actually held that dismissal of the fraud claim was required, because the fraud claim did not give rise to damages separate and distinct from those flowing from the plaintiff's claim of clergy malpractice. *Schmidt,* 779 F.Supp. at 326. It is of interest, however, that the fraud claim in that case did involve an affirmative misrepresentation that a clergyman's sexual relationship with the plaintiff "was special and acceptable in the eyes of the Lord." *See id.*

5. The silence of church officials about a priest's past misconduct, however, may be relevant to the liability of a church and dio-

cese for subsequent misconduct by a priest. *See, e.g., Smith v. O'Connell,* 997 F.Supp. 226, 239–40 (D.R.I.1998) (the silence of a church and diocese concerning certain priests' past sexual misconduct did not establish "fraudulent concealment" of the plaintiff's sexual abuse claim when the plaintiff was *subsequently* abused, although their prior knowledge of the priests' past misconduct might go to the liability of the church and diocese for the priests' present misconduct, and their silence might be pertinent to a "failure to warn" claim). In *Smith,* "fraudulent misrepresentation" was asserted as a ground for tolling the statute of limitations on sexual abuse claims, not as an independent tort claim for damages against either the priests or the church and diocese. *Smith,* 997 F.Supp. at 239–40.

fraudulent concealment claim, *see Jones Distrib. Co.*, 943 F.Supp. at 1473; *Cutler*, 588 N.W.2d at 430—is an "insuperable bar" to Doe's fraudulent concealment claim, requiring its dismissal. *See Parnes*, 122 F.3d at 546; *Frey*, 44 F.3d at 671. The defendants' motions to dismiss Count II of the Present Complaint will therefore be granted.

### 4. Breach of fiduciary duty

Doe asserts two separate breach-of-fiduciary-duty claims, one against defendants Diocese and Soens (Count III), and one against defendant Hartz (Count IV). Count III alleges breach by the Diocese and Soens of "a duty to act in the best interests" of Doe "(a) by failing to notify Plaintiff that she was in danger of being the victim of sexual abuse at the hands of Defendant Hartz" and "(b) by failing to provide Defendant Hartz with professional counseling services to protect Plaintiff from being sexually abused by Defendant Hartz." Present Complaint, ¶¶ 46–47. Doe does not, however, specifically allege from whence this duty of the Diocese and Soens arose. Doe alleges a similar duty on the part of defendant Hartz, this time alleging that, "[a]s a member of the clergy," Hartz had a duty to act in her "best interests," and specifically a duty "to not sexually abuse the Plaintiff." Present Complaint, ¶ 50. Doe alleges that defendant Hartz breached this duty "when he fondled and kissed the Plaintiff for the purpose of arousing and/or satisfying his sexual desires." *Id.* at ¶ 51.

Defendants Diocese and Soens challenge Doe's assertion that there is any fiduciary duty on their part to Doe, citing contrary authority in other jurisdictions. They acknowledge that the definition of fiduciary duty under Iowa law is quite broad, but they contend that even if Doe reposed some trust in them, they were not aware of and did not assent to any such fiduciary duty, because there are no allegations that the Diocese or Soens had any contact or dealing with Doe prior to the alleged incidents on December 3, 1994. They also challenge the obligations that purportedly flowed from the alleged fiduciary duty as too vague and general to be actionable. Doe contends that this claim is nonetheless viable, because the facts alleged show that, owing to the power and position of these defendants in relation to her, a fiduciary duty arose. She also argues that Soens assumed a fiduciary duty by stating that he would handle the matter, when she complained to him of Hartz's conduct, but that he breached this duty when he did nothing.

Defendant Hartz characterizes Doe's breach-of-fiduciary-duty claim as a claim for "clergy malpractice," which no jurisdiction has authorized. He again argues that his status as a priest is not sufficient to establish a fiduciary duty, when Doe has alleged no other specific relationship between himself and Doe that would give rise to a relationship of trust. Doe argues that some jurisdictions have recognized claims for breach of fiduciary duty against members of the clergy. She argues that the facts alleged here show that Hartz owed her a fiduciary duty, because of the power and position he enjoyed in relation to her.

#### a. When does the duty arise?

As this court recently explained, the Iowa Supreme Court has defined a fiduciary duty as follows:

"A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship." *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 1986) (citing Restatement (Second) of Torts § 874 cmt. a (1979)). We have also noted that

a confidential relationship "exists when one person has gained the confidence of another and purports to act

or advise with the other's interest in mind.... The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done. [The][p]urpose of the doctrine is to defeat and protect betrayals of trust and abuses of confidence."

*Hoffman v. National Med. Enters., Inc.,* 442 N.W.2d 123, 125 (Iowa 1989) (quoting *Oehler v. Hoffman,* 253 Iowa 631, 635, 113 N.W.2d 254, 256 (1962))....

.... [W]e are cognizant of the fact that "[b]ecause the circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case." *Kurth,* 380 N.W.2d at 696.

*Oeltjenbrun v. CSA Inv., Inc.,* 3 F.Supp.2d 1024, 1053 (N.D.Iowa 1998) (quoting *Wilson v. IBP, Inc.,* 558 N.W.2d 132, 138 (Iowa 1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997)); *see also Corcoran v. Land O'Lakes, Inc.,* 39 F.Supp.2d 1139, 1154 (N.D.Iowa1999) (quoting *Oeltjenbrun* ); *Economy Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641, 647–48 (Iowa 1995) (also recounting indicia of a fiduciary relationship); *Anderson v. Boeke,* 491 N.W.2d 182, 188 (Iowa Ct.App.1992) (" 'A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship,' " quoting *Kurth,* 380 N.W.2d at 695, in turn quoting Restatement (Second) of Torts § 874 cmt. a).

▆▆▆ As this court also explained in *Oeltjenbrun* and *Corcoran,*

"Some of the indicia of a fiduciary relationship include the acting of one person for another; the having and exercising of influence over one person by another; the inequality of the parties; and the dependence of one person on another." *Irons v. Community State Bank,* 461

N.W.2d 849, 852 (Iowa Ct.App.1990). Fiduciary duty arises, for example, between attorneys and clients, guardians and wards, and principals and agents. *Kurth,* 380 N.W.2d at 698; *accord Engstrand v. West Des Moines State Bank,* 516 N.W.2d 797, 799 (Iowa 1994) (citing *Kurth* ).

*Oeltjenbrun,* 3 F.Supp.2d at 1053; *Corcoran,* 39 F.Supp.2d at 1154 (quoting *Oeltjenbrun* ); *accord Zumaris,* 538 N.W.2d at 647–48 ("A 'fiduciary relation' arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other.").

### b. Breach of fiduciary duty of clergy

▆▆▆ The parties are correct that no decision of an Iowa court specifically explores whether a fiduciary or confidential relationship, and attendant duty, can exist between a member of the clergy, a diocese, or a bishop and an individual parishioner. However, Iowa law appears to leave the door open for recognition of such a relationship in appropriate circumstances.

Iowa authority on this subject provides:

A person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation. Fiduciary relations include not only the relation of trustee and beneficiary, but, also, among others, those of guardian and ward, agent and principal, attorney and client. Although the relation between two persons is not a fiduciary relation, it may, nevertheless, be a confidential relation. A confidential relation exists between two persons when one has gained the confidence of the other and purports to

act or advise with the other's interest in mind. A confidential relation may exist although there is no fiduciary relation; it is particularly likely to exist where there is a family relationship or one of friendship or such relation of confidence as that which arises between physician and patient or *priest and penitent.*

*Merritt v. Easterly,* 226 Iowa 514, 517–18, 284 N.W. 397, 399 (1939).

*Cruikshank v. Horn,* 386 N.W.2d 134, 138 (Iowa App.1986) (emphasis added). Doe has not alleged, however, that she reposed any confidence in any of the defendants in the course of confession, *i.e.,* while she was in contact with them "as a penitent," or that any such confidence was betrayed. *Cf. id.; see also Oeltjenbrun,* 3 F.Supp.2d at 1053 (noting that "[the][p]urpose of the [confidential relationship] doctrine is to defeat and protect betrayals of trust and abuses of confidence") (quoting *Hoffman,* 442 N.W.2d at 125). Instead, she asserts a confidential or fiduciary relationship arising from defendant Hartz's status as her priest, *see* Present Complaint, Count IV, ¶ 50, and apparently from the Diocese's and Soens's status in the church hierarchy.

As some of the recent decisions on the issue demonstrate, there is a split in authority concerning whether and under what circumstances relationships between members of the clergy or a diocese and an individual parishioner can give rise to an actionable fiduciary duty. *Compare, e.g., Sanders v. Casa View Baptist Church,* 134 F.3d 331, 337 (5th Cir.1998) (allowing a breach-of-fiduciary-duty claim to proceed against a priest, over assertions of a First Amendment bar, because the fiduciary duty alleged arose from a counseling relationship, not simply a priest-parishioner relationship), *cert. denied sub nom. Baucum v. Sanders,* —— U.S. ——, 119 S.Ct. 161, 142 L.Ed.2d 132 (1998); *F.G. v. MacDonell,* 150 N.J. 550, 696 A.2d 697, 702–04 (1997) (a breach-of-fiduciary-duty claim

based on sexual abuse of a parishioner by a priest, arising from a counseling relationship, was permissible under New Jersey law and did not involve entanglement in violation of the First Amendment; the New Jersey Supreme Court cited jurisdictions recognizing such a claim); *with Dausch v. Rykse,* 52 F.3d 1425 (7th Cir. 1994) (dismissing a breach-of-fiduciary-duty claim against a pastor on the grounds that Illinois state law did not permit such a claim and it would violate the First Amendment); *Kelsey v. Ray,* 719 A.2d 1248, 1251 (D.C.Ct.App.1998) (a claim by members of a church alleging breach of fiduciary duty against a pastor, current and former deacons, current and former trustees concerning management of church property would violate the First Amendment); *Doe v. Evans,* 718 So.2d 286, 291–92 (Fla.Dist.Ct.App.1998) (rejecting a breach-of-fiduciary-duty claim on First Amendment grounds); *Gray v. Ward,* 950 S.W.2d 232, 234 (Mo.1997) (*en banc*) (claim against a diocese for breach of fiduciary duty "to its parishioners and especially young boys such as the plaintiff to protect them [from sexual abuse by a priest], especially in those situations where they shared the [sic] inner most feelings with priests" was "simply a recharacterization of those [allegations] in [the plaintiff's] other claims," and was properly dismissed). Thus, it appears to this court that whether or not a breach-of-fiduciary-duty claim can be asserted against a member of the clergy, a diocese, or a bishop is something of an open question.

The defendants all specifically rely on *Schieffer v. Catholic Archdiocese of Omaha,* 244 Neb. 715, 508 N.W.2d 907 (1993), as rejecting a cause of action for breach of fiduciary duty based on sexual misconduct by a member of the clergy. In *Schieffer,* the Nebraska Supreme Court first rejected "clergy malpractice" claims, which asserted essentially "breach of professional standards by a priest," because "[s]o far as

we have been able to determine, no jurisdiction to date has recognized a claim for clergy malpractice." *Schieffer*, 508 N.W.2d at 911. The Nebraska Supreme Court then noted that some courts had allowed recovery on the theory of breach of fiduciary duty with regard to sexual misconduct of a member of the clergy with a parishioner. *Schieffer*, 508 N.W.2d at 912. However, the court adopted the reasoning of the United States District Court for the Southern District of New York in *Schmidt v. Bishop*, 779 F.Supp. 321 (S.D.N.Y.1991), which had rejected the claim:

> The *Schmidt* court recognized that with regard to a breach-of-fiduciary cause of action against a member of the clergy, there are many constitutional difficulties with regard to defining a standard of care. The *Schmidt* court reasoned:
>
>> [I]n analyzing and defining the scope of a fiduciary duty owed persons by their clergy, the Court would be confronted by the same constitutional difficulties encountered in articulating the generalized standard of care for a clergyman required by the law of negligence.... [A]s with her negligence claim, [the plaintiff's] fiduciary duty claim is merely another way of alleging that the defendant grossly abused his pastoral role, that is, that he engaged in malpractice.
>
> (Emphasis omitted.) *Schmidt v. Bishop*, 779 F.Supp. at 326. We agree with the reasoning of the court in the *Schmidt* case.

*Schieffer*, 508 N.W.2d at 912.

With all due respect to the Nebraska Supreme Court and the United States District Court for the Southern District of New York, however, this court does not believe that a breach-of-fiduciary-duty claim against a member of the clergy can necessarily be characterized simply as "clergy malpractice," defined as "breach of professional standards by a priest." *Cf.*

*Schieffer*, 508 N.W.2d at 912. At least under Iowa law, a fiduciary duty is not imposed according to "professional standards" of any profession or vocation. It is instead imposed by circumstances in which one party " 'is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship,' " *Oeltjenbrun*, 3 F.Supp.2d at 1053 (quoting *Kurth*, 380 N.W.2d at 695, in turn citing RESTATEMENT (SECOND) OF TORTS § 874 cmt. a (1979)), and indicia of such a relationship are not premised on the profession or vocation of the actor, but upon such things as " 'the acting of one person for another; the having and exercising of influence over one person by another; the inequality of the parties; and the dependence of one person on another.' " *Id.* (quoting *Irons*, 461 N.W.2d at 852). Thus, whether a fiduciary relationship exists depends upon factual circumstances, not upon professional standards of conduct for the average reasonable member of the clergy. *See Doe v. Evans*, 718 So.2d 286, 291 (Fla.Dist.Ct.App.1998) (rejecting the contention that a breach-of-fiduciary-duty claim against a member of the clergy is a "clergy malpractice" claim, because the plaintiff had alleged the elements of a breach-of-fiduciary-duty claim, not a clergy malpractice claim, but rejecting such a claim on First Amendment grounds); *F.G. v. MacDonell*, 150 N.J. 550, 696 A.2d 697, 702–04 (1997) ("Unlike an action for clergy malpractice, an action for breach of fiduciary duty does not require establishing a standard of care and its breach, [but instead] requires proof that a parishioner trusted and sought counseling from the pastor. A violation of that trust constitutes a breach of duty."); *Moses v. Diocese of Colorado*, 863 P.2d 310, 321 & n. 13 (Colo.1993) (*en banc*) ("We have declared that breach of fiduciary duty and clergy malpractice are not identical claims and involve different elements," because breach of fiduciary duty does not require a

professional relationship or a professional standard of care, citing *Destefano v. Grabrian,* 763 P.2d 275, 284 (Colo.1988)), *cert. denied,* 511 U.S. 1137, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994).

Therefore, this court cannot find that breach-of-fiduciary-duty claims against members of the clergy are barred *ab initio.* Rather, the question under Iowa law is whether facts giving rise to a fiduciary relationship and consequent duties have been alleged. *See, e.g., Oeltjenbrun,* 3 F.Supp.2d at 1053.

### c. Duty and breach here

■ *i. The Diocese and Soens.* Doe has pleaded only in conclusory fashion in the Present Complaint the basis for the assertion of a fiduciary or confidential relationship between Soens and the Diocese, on one hand, and Doe, on the other:

> 46. Defendants Roman Catholic Diocese of Sioux City, Iowa, and Defendant Soens had fiduciary obligations to act in the best interests of the Plaintiff.

Present Complaint, Count III, ¶ 46. A further factual basis for any claims against defendant Soens and the Diocese must therefore arise from the allegations in the "Factual Background" of the Present Complaint, specifically ¶¶ 19–21 & 25. However, these paragraphs do not allege any confidential or fiduciary relationship between Soens or the Diocese and Doe or any basis for such a duty that could be breached in the manner alleged. According to the Present Complaint, Doe had no direct relationship with the Diocese or Soens prior to the incidents involving defendant Hartz on December 3, 1994. Thus, there are no allegations that, prior to the incidents purportedly constituting their breach of a fiduciary duty, the Diocese and Soens were acting for Doe; that they had or exercised influence over Doe; that there was any inequality of the parties with respect to some specific transaction or interaction; or that Doe was dependent

upon either the Diocese or Soens. *Compare Oeltjenbrun,* 3 F.Supp.2d at 1053 (citing these indicia of a fiduciary relationship, quoting *Irons,* 461 N.W.2d at 852).

Doe points to the decision in *Moses v. Diocese of Colorado,* 863 P.2d 310 (Colo. 1993) (*en banc*), *cert. denied,* 511 U.S. 1137, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994), as supporting assertion of a fiduciary duty claim against a diocese or bishop arising from sexual misconduct of a priest. She contends that *Moses* is "remarkably similar" to the case at hand, in that the plaintiff informed the bishop of the priest's sexual misconduct, but that the bishop then did virtually nothing about the misconduct. The court in *Moses* found that the fiduciary relationship arose from the unequal positions of the parties *regarding the incident,* the bishop's authority to resolve conflicts, and his assumption of control of the situation. *Moses,* 863 P.2d at 322; *compare Brown v. Pearson,* 326 S.C. 409, 483 S.E.2d 477, 485 (Ct.App.1997) ("[T]he mere expectation on the part of the [plaintiff parishioners] that [the church and its superintendent] would take action on their complaints [of sexual abuse by a pastor] create any [fiduciary] relationship."). The court held further that the bishop breached his fiduciary duty by failing to act to resolve the problem, instead taking actions that injured the plaintiff further. *Id.* at 322–23.

Doe contends that her cause of action is also one where, under the facts as pleaded, Soens and the Diocese assumed a fiduciary duty to the plaintiff to resolve the problem of defendant Hartz's conduct, and then breached that duty by failing to do anything effective about the priest's misconduct. Unfortunately, Doe has not pleaded in the Present Complaint that Soens and the Diocese assumed a fiduciary responsibility to respond to her allegations of sexual misconduct by Hartz, but then failed to fulfill that duty by doing something about his misconduct. Instead, she alleges in Count III of the Present Complaint only

that the Diocese and Soens had "fiduciary obligations to act in the best interests of the Plaintiff," but breached that duty "(a) by failing to notify Plaintiff that she was in danger of being the victim of sexual abuse at the hands of Defendant Hartz," and "(b) by failing to provide Defendant Hartz with professional counseling services to protect Plaintiff from being sexually abused ·by Defendant Hartz." Present Complaint, ¶¶ 46–47. Put simply, Doe has alleged breach of fiduciary duties by the Diocese and Bishop that *failed to prevent* the sexual misconduct by Hartz, not an assumption of responsibility to deal with that misconduct once it had occurred, and subsequent breach of the duty assumed. *Cf. Moses,* 863 P.2d at 323.

■ Furthermore, a breach-of-fiduciary-duty claim arising from assumption of responsibility to deal with defendant Hartz's misconduct is an entirely distinct breach-of-fiduciary-duty claim from that actually pleaded: First, the assumption of duty, based on Doe's complaint to Soens and Soens's promise to look into the complaint, is grounded on a separate incident *following* defendant Hartz's misconduct, whereas the duty in the breach-of-fiduciary-duty claim actually pleaded purportedly arises simply from the status of the Diocese and Soens; and, second, breach of the duty thus purportedly assumed is grounded on a separate incident *following* defendant Hartz's misconduct, in which the Diocese and Soens purportedly did not fulfill their duty to investigate and· deal with Hartz's misconduct, but the breach-of-fiduciary-duty claim pleaded asserts the breach was the prior failure to warn of the danger posed by defendant Hartz and the prior failure to prevent his misconduct. Where a claim involves a different duty allegedly arising from different circumstances, and is purportedly based on different circumstances constituting the breach of duty, it is an entirely distinct

claim, not another specification of breach of duty on the same claim.

■ Nor can Doe now assert a breach-of-fiduciary-duty claim against the Diocese and Soens ·based on assumption of a fiduciary duty to deal with ·defendant Hartz's misconduct. Such a "new" or "distinct" cause of action was not asserted in the Original ·Complaint, and thus is not "saved" from untimeliness by Iowa Code § 614.10. *See supra* at II.A.2.b.iii. Allegations· that these defendants assumed responsibility for investigating Hartz's sexual misconduct, then failed to respond properly to that misconduct, are found in the Present Complaint, but in the "tortious infliction" allegations against the Diocese and Soens. *See* Present Complaint, Count VI, ¶ 62. Again, those allegations of "tortious infliction" have already been stricken· as untimely, because no "tortious infliction" claim was leveled against these defendants in ·the Original Complaint. *See* II.A.2.b.iii above. Although a breach-of-fiduciary-duty ·claim ·was leveled against these defendants in the Original Complaint, the breach-of-fiduciary-duty claim founded on assumption of a duty to deal with Hartz's misconduct is still not the "same claim" as pleaded in the Original Complaint, because it is founded on a duty and breach of duty arising from circumstances that are distinct from those upon which the original breach-of-fiduciary-duty claim was based. To put it another way, the Original Complaint, while it gave notice that Doe alleged injury from a breach of fiduciary duty by the Diocese and Soens for failing to warn of the danger posed by Hartz and failing to prevent his misconduct, it gave no notice to these defendants that a breach of fiduciary duty allegedly arose from a different transaction, their conduct *after* defendant Hartz's misconduct.

Moreover, unlike the plaintiff in *Moses,* who both pleaded and proved that some injury flowed from the bishop's assumption

of responsibility to deal with the priest's misconduct and his actual handling of that situation, *see Moses,* 863 P.2d at 321 ("The facts of [the plaintiff's] case indicate that an organization, confronted with the misdeeds of one of its agents, assumed control of the matter and in the process of protecting itself injured a vulnerable individual."), the court finds no argument in the brief asserting the *Moses*-style breach-of-fiduciary-duty claim that Doe was injured by the failure of the Diocese and Soens to act to resolve the problems caused by Hartz's misconduct. In the Present Complaint, Doe alleges that she "left the St. Lawrence Church congregation as a result of the sexual abuse by Defendant Hartz," and that she "removed her child from St. Lawrence School as a result of the sexual abuse by Defendant Hartz," but the only "sexual abuse" is alleged to have occurred on December 3, 1994, not after the first contact between Soens and Doe. *See* Present Complaint, ¶ 28. Thus, no injury from the *Moses*-style breach of fiduciary duty has been either pleaded or alleged in Doe's brief. Doe's failure to allege injury or damages is fatal to her *Moses*-style breach-of-fiduciary-duty claim. *See* Iowa Civil Jury Instructions No. 3200.1 (including in the elements of a claim of breach of fiduciary duty that the breach was a proximate cause of damage to the plaintiff, and the amount of such damage).

Therefore, *Moses* does not establish the viability of the breach-of-fiduciary-duty claim Doe has actually pleaded against Soens or the Diocese; a *Moses*-style breach-of-fiduciary-duty claim is untimely; and, if such a claim were timely, Doe has failed to state a *Moses*-style claim upon which relief can be granted.

To return to the allegations of breach of fiduciary duty actually made against the Diocese and Soens in the Present Complaint, Doe asserts that these defendants breached their duty to act in Doe's best interests "(a) by failing to notify Plaintiff that she was in danger of being the victim of sexual abuse at the hands of Defendant Hartz [and] (b) by failing to provide Defendant Hartz with professional counseling services to protect Plaintiff from being sexually abused by Defendant Hartz." Present Complaint, ¶¶ 46–47. These allegations, the court notes, are simply alternative pleadings of claims of negligent failure to warn and negligent supervision, the latter of which has been pleaded here (in Count IX), although in this count, the failures are alleged to be breaches of a fiduciary duty, instead of breaches of an employer's duty. As noted above, however, Doe has failed to allege adequately the basis for a fiduciary duty on the part of the Diocese and Soens, because there was no contact, and hence no basis for a fiduciary duty, prior to Hartz's misconduct; as is explained more fully below, the status of the Diocese and Soens, or any member of the clergy, is an insufficient basis for asserting such a duty. The failure to allege a basis for a fiduciary duty is an "insuperable bar" to assertion of a breach-of-fiduciary-duty claim against these defendants. *See Parnes,* 122 F.3d at 546; *Frey,* 44 F.3d at 671. Therefore, the defendants' motion to dismiss Count III must be granted.

■ *ii. Defendant Hartz.* The court therefore turns to Count IV, the breach-of-fiduciary-duty claim against defendant Hartz. Doe specifically alleges that Hartz's fiduciary duty arose from his status as a priest. *See* Present Complaint, Count IV, ¶ 50 ("As a member of the clergy, Defendant Hartz had fiduciary obligations to act in the best interests of the Plaintiff."). For much the same reason the court does not believe that status as a priest, standing alone, is enough to serve as a representation to refrain from sexual misconduct, the court does not believe that status as a priest, standing alone, is enough to establish a fiduciary duty to all and sundry to refrain from certain conduct.

Rather, in those cases permitting a breach-of-fiduciary-duty claim against a member of the clergy to go forward, the claim was allowed because something more than a general priest-parishioner relationship was the basis for the fiduciary duty. The court finds the decision of the Fifth Circuit Court of Appeals in *Sanders v. Casa View Baptist Church*, 134 F.3d 331 (5th Cir.1998), to be instructive. In *Sanders*, the Fifth Circuit Court of Appeals compared and contrasted the allegations of a fiduciary relationship in the case before it with those presented to the Seventh Circuit Court of Appeals in *Dausch v. Rykse*, 52 F.3d 1425 (7th Cir.1994):

> [In *Dausch,*] Judge Ripple explained that Dausch's fiduciary duty claim was dismissed, in part, because she alleged, in "contrast to the other counts of [her] complaint," that "the breach of fiduciary duty occurred in the context of a pastor-parishioner relationship." [*Dausch,* 52 F.3d at 1438 (Ripple, J., concurring)]. That is, Dausch asserted that her pastor was her fiduciary, not because of his conduct as her counselor, but simply because of her status "as a member of the congregation ... seeking counseling" and his status as her "pastor and counselor." *Id.* In contrast, the jury in this case was instructed that the primary relationship between a minister and a parishioner is not a fiduciary one, and that Baucum could not be held liable for breaching his fiduciary duties unless he "acquired and abused" influence and "betrayed" confidences learned in a "relationship of trust."

*Sanders,* 134 F.3d at 337 n. 6.[6]

Other courts permitting breach-of-fiduciary-duty claims against members of the clergy have also required something more than a priest-parishioner relationship. For example, in *F.G. v. MacDonell*, 150 N.J. 550, 696 A.2d 697 (1997), the New Jersey Supreme Court permitted such a claim where the pastor had accepted the parishioner for specific "pastoral" counseling. *See F.G.*, 696 A.2d at 700 & 704. The court wrote,

> Trust and confidence are vital to the counseling relationship between parishioner and pastor. By accepting a parishioner for counseling, a pastor also accepts the responsibility of a fiduciary. Often parishioners who seek pastoral counseling are troubled and vulnerable. Sometimes, they turn to their pastor in the belief that their religion is the most likely source to sustain them in their time of trouble. The pastor knows, or should know of the parishioner's trust and the pastor's dominant position.

*F.G.*, 696 A.2d at 704. The court then cited other cases, including the decisions of the Colorado Supreme Court in *Destefano* and *Moses*, in which such a claim had been permitted in cases involving sexual misconduct of a clergyman, noting that in the first case, the parishioner had sought marital counseling from the priest, and in the second, that the parishioner had also been involved in a specific "counseling relationship" with the priest. *See id.* (citing *Destefano*, 763 P.2d at 284, and *Moses*, 863 P.2d at 314).

Here, no such counseling relationship between Hartz and Doe has been alleged. Instead, Doe alleges simply that Hartz's fiduciary duty to her was because he was "a member of the clergy." Present Complaint, Count IV, ¶ 50. This general priest-parishioner relationship is not enough to establish a fiduciary duty. The failure to allege a basis for a fiduciary duty is an "insuperable bar" to assertion of a breach-of-fiduciary-duty claim against these defendants. *See Parnes*, 122 F.3d at 546; *Frey*, 44 F.3d at 671. Therefore, like the breach-of-fiduciary-duty claim against defendants Soens and the Diocese, the breach-of-fiduciary-duty claim against defendant Hartz in Count IV must be dismissed.[7]

---

6. The Fifth Circuit Court of Appeals concluded in *Sanders* that there was no First Amendment bar to prosecution of the breach-of-fiduciary-duty claim against the defendant priest-as-counselor. *Sanders,* 134 F.3d at 337–38.

7. The court does not believe that a breach-of-fiduciary-duty claim against a member of the

### 5. Assault

██ Count V is a claim denominated as "assault" against defendant Hartz. The claim is founded on the allegation that "[a]fter Defendant Hartz sexually assaulted Plaintiff, he placed Plaintiff in fear of offensive physical contact." Present Complaint, Count V, ¶ 54. Although only the conduct of defendant Hartz appears to be at issue, the prayer seeks judgment against *all* defendants. *Id.* at Count V, prayer. This claim is also a verbatim repleading of the comparable claim in the Original Complaint. *See* Original Complaint, Count 6.

The Church Defendants seek to dismiss this count as to them, because Doe has alleged no facts to support her conclusion that the church defendants should be liable. Doe asserts *respondeat superior* liability of the Church Defendants for Hartz's purported assault, both in response to the motion to dismiss this count and in a separate count of the Present Complaint, Count XII. The court deems it more sensible to consider *respondeat superior* liability of the Church Defendants *infra*, after the court has determined which counts of the Present Complaint against defendant Hartz state claims upon which relief can be granted.

Defendant Hartz finds the allegations of Count V confusing, although he has not moved for a more definite statement of the claim pursuant to FED.R.CIV.P. 12(e). He suggests that, because the "assault" alleg-

edly took place *after* the alleged "sexual abuse," presumably meaning "after" the "sexual abuse" alleged in Count I, and there is no claim for battery in this count, Doe must be relying on some conduct different from that alleged in Count I. He opines that the claim may be based on either the incident in which Hartz waited for Doe to shake his hand during the "sign of peace" in the mass, *see* Present Complaint, ¶ 14; or the time when Hartz requested a meeting with Doe and her husband, but Doe and her husband refused to permit such a meeting in their home, and Doe's husband instead met with Hartz at the rectory, *see id.* at ¶ 22; or the time when Hartz asked to meet with Doe to apologize to her, but she was "unable to meet with [him]." *See id.* at ¶ 24. Hartz argues that none of these incidents will support an assault claim, because Doe has not alleged facts sufficient to support a claim that Hartz acted with the intent to put her in fear of physical pain, injury, or fear of physical contact that would be insulting or offensive.

Doe argues that she has adequately alleged both assault, as reasonable fear of offensive physical contact, and battery, as actual offensive contact, at the hands of defendant Hartz. She contends that, because Hartz had previously grabbed and kissed her, she was put in eminent fear that he would act in such a way again. She argues that her fear of unwanted physical contact was "undeniable" when

---

clergy, a diocese, or a bishop necessarily runs afoul of the First Amendment, as the defendants have contended. *See, e.g., Sanders,* 134 F.3d at 335–38; *F.G.,* 696 A.2d at 701–03; *Moses,* 863 P.2d at 319–21. However, because the court has found the breach-of-fiduciary-duty claims wanting on non-constitutional grounds, it does not reach this constitutional question. *See Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) ("'Prior to reaching any constitutional questions, federal courts must consider

nonconstitutional grounds for decision.' *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); *Mobile v. Bolden,* 446 U.S. 55, 60, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *Kolender v. Lawson,* 461 U.S. 352, 361, n. 10, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983), citing *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). This is a 'fundamental rule of judicial restraint.' *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering,* 467 U.S. 138, 104 S.Ct. 2267, 81 L.Ed.2d 113 (1984).'').

Hartz approached her to shake her hand during the mass, and that later Hartz made actual offensive physical contact with her when he rubbed her back. Doe concedes that such contact might not otherwise rise to the level of an assault (or battery), but that it does when the conduct comes from the same priest who had only moments before grabbed and kissed her against her will. She contends further that the "intent" element of assault is satisfied if the offender intends to do the act that constitutes the assault, citing *Bacon v. Bacon*, 567 N.W.2d 414 (Iowa 1997).

Like Hartz, this court finds that Count V is vague as to what conduct Doe alleges constituted an assault. This count states only that the alleged assault occurred "after" the sexual assault. *See* Present Complaint, Count V, ¶ 54. The "sexual abuse" count, Count I, however, was based on *both* the alleged grabbing and kissing before the mass, and the alleged back rubbing after the mass. *See id.*, Count I, ¶ 30. Hence, read in isolation, the complaint in Count V would appear to refer only to events *after* the back rubbing on December 3, 1994. However, Doe appears to assert in her brief that the claim is based on the hand-shaking incident during the mass on December 3, 1994, and the back-rubbing incident after the mass that same day. Thus, the reference point for the "assault" alleged in Count V appears, from Doe's arguments, to be intended to refer to incidents *after* the initial grabbing and kissing before the mass on December 3, 1994, and the grabbing and kissing must constitute the "sexual assault" to which Doe refers in paragraph 54. The conduct at issue in Count V must therefore be the alleged hand-shaking incident and the post-mass back rubbing. Because Doe does not respond to Hartz's hypothesis that the claim might be founded on events after December 3, 1994, such as Hartz's two requests for meetings with Doe, the court concludes that Doe has eschewed these incidents as the basis for her "assault" claim.

The court found that the offense asserted in Count I was properly construed as an assault or battery, founded on the grabbing and kissing *and* the post-mass back rubbing. Thus, the back-rubbing incident is already encompassed within another assault and battery claim. The only different conduct upon which the present "assault" claim can be based is therefore the hand-shaking incident. Although it is with considerable reservations, the court finds that this incident may constitute an assault or battery as the elements of those torts were defined in section II.B.2.c. of this decision. Doe has alleged both threatened offensive touching and actual offensive touching, and some basis for her fear or apprehension. Furthermore, under Iowa law, a person can be presumed to intend the natural consequences of an act intentionally done, *see, e.g., Estate of Tedrow v. Standard Life Ins. Co. of Indiana*, 558 N.W.2d 195, 197 (Iowa 1997) (citing *Lukecart v. Swift & Co.*, 256 Iowa 1268, 1283, 130 N.W.2d 716, 724 (1964), for the proposition that "a person is presumed to intend the natural consequences of an act intentionally done") so that Hartz's contention that no "intent" has been alleged fails. The question of whether assault and battery claims based on the hand-shaking incident should in fact go to a jury is better left to a summary judgment motion after discovery.

Therefore, the defendants' motions to dismiss Count V will be denied.

### 6. Tortious infliction of severe emotional distress

Because the court concluded above that Doe's claim of tortious infliction of emotional distress against Soens and the Diocese was untimely, *see* § II.A.2.b.iii, the only remaining "tortious infliction" claim is that against defendant Hartz. That claim is based on the allegation that "Defendant

Hartz sexually abused Plaintiff on December 3, 1994," Present Complaint, Count VI, ¶ 60, and that "[t]he conduct of [Hartz] toward the Plaintiff was so outrageous as to go beyond all possible bounds of decency, and is to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* at ¶ 63.

Hartz contends that, because there was no "sexual abuse," this claim for tortious infliction necessarily also fails. Furthermore, even if the conduct did not constitute "sexual abuse," but was somehow otherwise tortious, Hartz contends that it was insufficiently "outrageous" as a matter of law to sustain a "tortious infliction" cause of action. Doe responds that Hartz's grabbing her and kissing her without her consent, when Hartz was her priest, is sufficiently "outrageous" to sustain her claim.

### a. Elements of the claim

This court has considered the elements of such a cause of action under Iowa law on a number of occasions. *See, e.g., Hanson v. Hancock County Mem. Hosp.*, 938 F.Supp. 1419, 1439–43 (N.D.Iowa 1996); *Reedy v. White Consol. Indus., Inc.*, 890 F.Supp. 1417, 1440–45 (N.D.Iowa 1995); *Thompto v. Coborn's, Inc.*, 871 F.Supp. 1097, 1122–24 (N.D.Iowa 1994); *Thomas v. St. Luke's Health Sys., Inc.*, 869 F.Supp. 1413, 1438–41 (N.D.Iowa 1994), *aff'd*, 61 F.3d 908, 1995 WL 416214 (8th Cir.1995) (table op.). More recent decisions of the Iowa Supreme Court do not disclose explanations of the tort different from those stated by this court. *See, e.g., Fuller v. Local Union No. 106, United Bhd. of Carpenters and Joiners of Am.*, 567 N.W.2d 419, 422–23 (Iowa 1997); *Ollinger v. Bennett*, 562 N.W.2d 167, 172–73 (Iowa 1997).

■ The elements for recovery on the common law tort of intentional infliction of emotional distress in Iowa are:

(1) outrageous conduct by the defendant;

(2) the defendant's intentional causing, or reckless disregard of the probability of causing emotional distress;

(3) plaintiff suffered severe or extreme emotional distress;

(4) actual and proximate cause of the emotional distress by the defendant's conduct.

*Hanson,* 938 F.Supp. at 1440; *Reedy,* 890 F.Supp. at 1440–41 (quoting *Millington v. Kuba,* 532 N.W.2d 787, 793 (Iowa 1995), and citing other cases so identifying the elements of the tort); *accord Fuller,* 567 N.W.2d at 423; *Ollinger,* 562 N.W.2d at 172–73. "It is for the court to determine in the first instance whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Id.* at 1440 (internal quotation marks and citations omitted). As this court explained in *Hanson,*

The allegation of outrageousness requires an extreme of egregiousness. *Van Baale [v. City of Des Moines],* 550 N.W.2d [153,] 155 [(Iowa 1996)] ("To satisfy the first element a defendant's conduct must be extremely egregious."); *Taggart [v. Drake Univ.],* 549 N.W.2d [796,] 802 [(Iowa 1996)] (same). In other words, the conduct complained of must be " 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.' " *Reedy,* 890 F.Supp. at 1441 (again quoting *Marks [v. Estate of Hartgerink],* 528 N.W.2d [539,] 546 [(Iowa 1995)], in turn quoting *Vinson v. Linn–Mar Community Sch. Dist.,* 360 N.W.2d 108, 118 (Iowa 1984)); *see also Dickerson [v. Mertz],* 547 N.W.2d [208,] 214 [(Iowa 1996)]; *Suntken [v. Den Ouden,* 548 N.W.2d 164,] 168 [(Iowa Ct.App.1996)]. Thus, the Iowa Supreme Court has required an extreme of egregiousness to elevate (or downgrade) mere bad conduct to the level of outrageousness. *Northrup v. Farmland Indus., Inc.,* 372

N.W.2d 193, 198 (Iowa 1985). Indeed, the Iowa court has said that

> [t]he tort law should encourage a certain level of emotional toughness. "The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." Restatement (Second) of Torts § 46, comment d, *supra.* "Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better protection than the law could ever be." Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harv.L.Rev. 1033, 1035 (1936).

*Northrup,* 372 N.W.2d at 198–99 (quoting *Meyer v. Nottger,* 241 N.W.2d 911, 918 (Iowa 1976)). Peculiar susceptibility, by reason of physical or mental condition of the person affected, is a factor in considering whether conduct is outrageous, although "major outrage" is always the crucial element of the tort. *Cutler v. Klass, Whicher & Mishne,* 473 N.W.2d 178, 183 (Iowa 1991) (quoting Restatement (Second) of Torts § 46, comment f).

*Hanson,* 938 F.Supp. at 1440–41; *accord Fuller,* 567 N.W.2d at 423 ("Before defendants' conduct can be considered outrageous, it must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'") (quoting *Harsha v. State Savs. Bank,* 346 N.W.2d 791, 801 (Iowa 1984)).

### b. "Outrageousness" of Hartz's conduct

██ Hartz seeks dismissal of this count of the Present Complaint only on the ground that Doe has not adequately pleaded the first element of the cause of action, outrageous conduct. Although the court agrees with the plaintiff that being grabbed and kissed against one's will involves conduct that is unacceptable from anyone, let alone from a purportedly celibate priest, the court cannot find that such *conduct* alone meets the requirement under Iowa law that the conduct be "'*so extreme in degree,* as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Fuller,* 567 N.W.2d at 423 (quoting *Harsha,* 346 N.W.2d at 801) (emphasis added); *accord Hanson,* 938 F.Supp. at 1440–41. An unsolicited kiss does not, as a general matter, satisfy this requirement.

██ Therefore, the conduct in question here can only be sufficiently outrageous because of the status of the actor, a purportedly celibate priest. Although the court has rejected above Doe's attempt to base either a duty of disclosure or a fiduciary duty on a defendant's status as a member of the clergy, the court does perceive that such status is relevant to the question of whether certain conduct by the defendant is "outrageous." The defendant's status as a member of the clergy may create a "[p]eculiar susceptibility" in the victim of the act, even though here the plaintiff is an adult woman, not a child. *See Cutler v. Klass, Whicher & Mishne,* 473 N.W.2d 178, 183 (Iowa 1991) ("Peculiar susceptibility, by reason of physical or mental condition of the person affected, is a factor in considering whether conduct is outrageous, although 'major outrage' is always the crucial element of the tort.") (quoting Restatement (Second) of Torts § 46, comment f). That is, the defendant's status as a member of the clergy may accentuate both the surprise and the repugnance of such an act to the victim, because his status creates a "mental condition" of certain expectations of appropriate

conduct by the defendant, although the same unsolicited kiss from another might amount to "mere bad conduct," disappointing, but regrettably neither all that unusual, surprising, or "outrageous" from a member of the community at large. *See Northrup v. Farmland Indus., Inc.,* 372 N.W.2d 193, 198 (Iowa 1985) (an extreme of egregiousness is required to transform mere bad conduct into outrageousness).

The court recognizes, however, that courts to consider a claim of intentional infliction of emotional distress based on sexual misconduct by a clergyman with a member of his congregation have permitted such claims only where considerably more egregious conduct was at issue. *See, e.g., Sanders v. Casa View Baptist Church,* 898 F.Supp. 1169, 1177 (N.D.Tex.1995) (evidence raised a genuine issue of material fact on the plaintiffs' allegations of outrageous conduct, where there was evidence that the defendant minister sexually harassed the plaintiffs at work, made graphic sexual comments and gestures, and engaged in sexual relationships with two of the plaintiffs who worked just a few feet from each other), *aff'd,* 134 F.3d 331 (5th Cir.1998), *cert. denied sub nom. Baucum v. Sanders,* — U.S. ——, 119 S.Ct. 161, 142 L.Ed.2d 132 (1998); *Walker v. Dickerman,* 993 F.Supp. 101, 102–03 & 106 (D.Conn.1997) (finding in the plaintiff's favor and awarding punitive damages on the plaintiff's claim of intentional infliction of emotional distress, because the defendant minister had engaged the plaintiff in years of sexual abuse, including oral sex and digital penetration, while the plaintiff was a minor); *Schieffer v. Catholic Archdiocese of Omaha,* 244 Neb. 715, 508 N.W.2d 907, 910–11 (1993) (an adult parishioner failed to state a claim for intentional infliction of emotional distress against a priest, despite years of consensual sexual relations in the course of counseling, because there were no allegations that the defendant used force or fraud to accomplish his sexual

relations or that her "vulnerability" made her incapable of consenting to what took place); *Destefano v. Grabrian,* 763 P.2d 275, 286 (Colo.1988) (*en banc*) (allegations that a Catholic clergyman took advantage of the plaintiff's vulnerable emotional state to induce her to engage in a sexual relationship after she consulted him for marriage counseling were sufficient to withstand the clergyman's motion to dismiss the plaintiff's claim of intentional infliction of emotional distress). Although the conduct in question here may be odious, when compared to cases involving much more intrusive sexual misconduct by members of the clergy, defendant Hartz's conduct is not, as a matter of law, sufficiently "outrageous" to support a claim of tortious infliction of emotional distress.

Consequently, defendant Hartz's motion to dismiss Count VI will be granted.

### 7. *Negligence claims against defendant Hartz*

Counts VII and VIII of the Present Complaint are negligence claims against defendant Hartz. The first of these counts alleges that "Defendant Hartz suffers from a mental disease or defect which renders him unable to control his conduct in connection with sexual behavior toward women and girls [and][a]s a result of [his] disease or defect, his acts against Plaintiff were not intentional, but were negligent in the particulars set forth above." Present Complaint, Count VII, ¶¶ 68–69. The second negligence count alleges that "At all times ... Defendant Hartz displayed the characteristics of a person suffering from a mental disease or defect that renders him unable to control his conduct in connection with sexual behavior toward women and girls"; that he "had a duty to restrain himself from sexually abusing Plaintiff" and "to obtain professional help to treat his mental disease or defect and to refrain from sexually abusing Plaintiff"; and that "Defendant Hartz failed in both of these

duties." Present Complaint, Count VIII, ¶¶ 70–73.

Defendant Hartz characterizes Count VII as more of an "editorial comment," than assertion of a cause of action. He points out that the count does not allege any specific duty he has purportedly breached, and that recovery for "sexual abuse" or "assault" has already been sought under other counts, making this claim duplicative. Hartz also points out that an assault must be "intentional," while this claim asserts merely "negligence," apparently suggesting that Doe's negligence claim must fail if it does not encompass the elements of "assault." Although Hartz admits that Count VIII identifies duties he has purportedly breached, he contends this count is also duplicative of Doe's "assault" and "sexual abuse" claims. He argues further that Doe has not alleged the elements of assault or sexual abuse in either of these counts.

Doe contends that these counts are proper alternative pleadings of grounds for recovery for Hartz's wrongful conduct, asserting a negligence standard. She asserts that "clearly" Hartz had a duty to restrain himself from sexually abusing her and a duty to obtain professional help for his mental defect. However, she does not argue from whence these duties purportedly arose. She distinguishes these claims from her "sexual abuse" and "assault" claims on the ground that the other counts require intentional conduct, whereas these alternatives require only negligence.

### a. Count VII

Because Count VII is premised on Hartz's "acts," apparently as previously pleaded, *see* Present Complaint, Count VII, ¶ 69, the court concludes that Doe is attempting to plead "negligent assault" and "negligent breach of fiduciary duty," *see* Present Complaint, Counts I & IV. The adequacy of the latter "negligence" claim is easily resolved, however—assuming

such a cause of action might otherwise exist—because where the court has found that Doe has failed to allege any fiduciary duty between Hartz and herself, she necessarily fails to state a claim that Hartz "negligently" breached such a duty.

 Whether Doe has stated a claim for "negligent assault" requires rather more discussion. Most courts have held that there is no tort cause of action for "negligent assault." *See, e.g., Wertzberger v. City of New York,* 254 A.D.2d 352, 680 N.Y.S.2d 260, 261 (N.Y.App.Div.1998) ("It is well settled that no cause of action to recover damages for negligent assault exists in New York.") (citing cases so holding); *Torrison v. Overman,* 250 Neb. 164, 549 N.W.2d 124, 132 (1996) (" 'There is no such cause of action as negligent assault and battery.' ") (quoting *State Farm & Cas. Co. v. van Gorder,* 235 Neb. 355, 455 N.W.2d 543, 545 (1990)); *Webb v. Jackson,* 583 So.2d 946, 951 (Miss.1991) (same); *Fulmer v. Rider,* 635 S.W.2d 875 (Tex. App.1982), *writ ref'd n.r.e.; see also* W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, § 10, at 46 (5th ed. 1984) ("There is, properly speaking, no such thing as a negligent assault."). Exceptions are jurisdictions in which the legislature has defined a crime of "negligent assault," which presumably would give rise to an analogous civil action for damages, *see* OHIO REV.CODE § 2951.08; WASH.REV. CODE § 9A.36.031(1)(f), and claims based on medical procedures without proper consent. *See Chouinard v. Marjani,* 21 Conn. App. 572, 575 A.2d 238, 242 (1990). However, the court finds no authority for a tort cause of action for negligent assault in either Iowa cases or Iowa statutes; rather, the Iowa Code defines assault as arising from intentional conduct, *see* IOWA CODE § 708.1(1) & (2), and the RESTATEMENT (SECOND) OF TORTS, upon which the Iowa civil actions for assault and battery are based, defines both assault and battery as arising from intentional conduct. *See* RE-

STATEMENT (SECOND) OF TORTS § 13 (battery), § 21 (assault). Therefore, the court concludes that there is no basis for this court to recognize a civil damages action for "negligent assault" under Iowa law. Consequently, Hartz's motion to dismiss Count VII will be granted.

### b. Count VIII

Count VIII alleges that defendant Hartz "displayed the characteristics of a person suffering from a mental disease or defect that renders him unable to control his conduct in connection with sexual behavior toward women and girls," and that Hartz therefore had two duties: (1) "a duty to restrain himself from sexually abusing Plaintiff"; and (2) a duty "to obtain professional help to treat his mental disease or defect and to refrain from sexually abusing Plaintiff." Present Complaint, Count VIII, ¶¶ 70–72. This count alleges breach of both of these duties. However, Doe has cited no authority—from Iowa or any other jurisdiction—for the proposition that a mental disease or defect of the kind identified gives rise to either of the duties asserted, and the court has found none. Lack of duty is an insuperable bar to a negligence claim. *See Parnes*, 122 F.3d at 546; *Frey*, 44 F.3d at 671; *see also Ries v. Steffensmeier*, 570 N.W.2d 111, 114 (Iowa 1997) ("Negligence is the breach of a known duty of care. *Marcus v. Young*, 538 N.W.2d 285, 288 (Iowa 1995). In the absence of a duty owed, there can be no legal breach."); *Fiala v. Rains,* 519 N.W.2d 386, 388 (Iowa 1994) (it is "axiom[atic] that in order for there to be negligence a recognized legal duty must exist that is owed the injured party by the alleged wrongdoer"). Therefore, Hartz's motion to dismiss Count VIII will also be granted.

### 8. *Negligence claims against the Church Defendants*

Doe also purports to have two separate negligence claims against the Church De-

fendants, a "negligent supervision" claim against "Defendants," in Count IX, and a second claim of "negligence" targeted only at defendants St. Lawrence Church and the Diocese, in Count X. Although the parties have crossed swords over these claims primarily on the question of their constitutionality, the initial question is whether the claims are simply duplicative.

The difference in defendants—apparently all three of the Church Defendants in Count IX, and only the Church and the Diocese in Count X—is of no moment, if the specifications of negligence in the two counts are the same: Any specifications of negligence against the Church Defendants must be considered separately as to each of them. As to the specifications of negligence themselves, the court can find nothing in the specifications of negligence in Count X that is not fully encompassed within the specifications of negligence in Count IX. The allegations that the Church and Diocese breached "a duty to protect Plaintiff from the abuse imposed upon her by Defendant Hartz," Count X, ¶¶ 81 & 82, is fully encompassed within the specification of negligence in paragraph 77(b) of Count IX, which alleges "failure to prevent Defendant Hartz from engaging in sexual abuse," and/or the specification in paragraph 77(d) of Count IX that the defendants "fail[ed] to supervise and/or control Defendant Hartz to ensure sexual aubse [sic] did not occur." One difference between the two claims is worthy of note, however: In Count X, Doe alleges that the defendants "knew" of Hartz's alleged mental disease or defect, apparently relying on this knowledge as the basis for the duties in question, see Present Complaint, Count X, ¶ 80, whereas in Count IX, the duties in question are alleged to arise from the Church Defendants' supervisory authority over Hartz. *See id.*, Count IX, ¶ 76. In light of the court's conclusion that Count X is, in most respects, duplicative of Count IX, the court will consider Counts IX and

X as a single claim of negligent supervision, reading the allegations of the two counts, and indeed of the complaint, as a whole.

The Church Defendants' non-constitutional challenge to Doe's negligent supervision claim is that, under Iowa law, a claim of negligent supervision or failure to protect another from wrongdoing by an employee against an employer is authorized only in narrow circumstances not present here, citing *D.R.R. v. English Enters., CATV*, 356 N.W.2d 580 (Iowa Ct. App.1984). This argument is simply untenable. As the Iowa Supreme Court recently stated, a claim of negligent hiring, which includes negligent supervision and retention, was recognized by the Iowa Court of Appeals in *English* "when the employer owes a special duty to the injured party." *Godar v. Edwards*, 588 N.W.2d 701, 708–09 (Iowa 1999). The special duty may arise from the circumstances in which the person hired or supervised, "because of their employment, may pose a threat of injury to members of the public." *Id.* at 709. In *Godar*, the circumstances in which the claim was recognized were not the "common carrier," "inn-keeper," or "person with access to plaintiff's dwelling" circumstances that the Church Defendants claim were the only ones authorized in *English;* rather, the claim was recognized in the circumstances of a negligent hiring, retention, and supervision claim against a school district arising from sexual abuse of a student by a district employee. *See Godar*, 588 N.W.2d at 703. This court reads *Godar* as sufficient support for a claim of negligent supervision against a church, diocese, and bishop arising from alleged assault by a priest on a parishioner, for the reason that, in this case, the employee, "because of [his] employment [as a priest], may pose a threat of injury to members of the public." *Id.* at 709. Thus, the Church Defendants had or are alleged to have the requisite special duty to Doe, a member of the public and a parishioner at the church where Hartz was employed, to support a failure to supervise claim.

In *Godar*, however, the Iowa Supreme Court concluded that the plaintiff's failure-to-protect claim failed, because "Godar failed to present sufficient evidence to suggest that the school district 'should have known' that Edwards was sexually abusing him or that the school district somehow breached a duty of care owed to Godar." *Id.* at 709. The court also held that the district court had properly dismissed the "negligent retention and supervision" claim, because the plaintiff conceded that the district had no actual knowledge of sexual abuse, and nothing in the record supported his claim that the district "should have known" of the abuse or even "should have been suspicious" that abuse was occuring. *Id.* at 709–10.

*Godar* is consistent with other Iowa decisions requiring a "special relationship" or "special duty" before liability can be imposed on a defendant for failure to protect the plaintiff from injury by a third party. Although a person may be negligent if the alleged wrongdoer realizes or should realize that the conduct in question involves an unreasonable risk of harm to another through the negligent, reckless, or criminal conduct of a third person, *see Fiala v. Rains*, 519 N.W.2d 386, 389 (Iowa 1994) (citing RESTATEMENT (SECOND) OF TORTS §§ 302, 302A, and 302B), "[g]enerally, a person has no duty to prevent a third person from causing harm to another." *Id.* (citing *Morgan v. Perlowski*, 508 N.W.2d 724, 726 (Iowa 1993); *Husker News Co. v. South Ottumwa Sav. Bank*, 482 N.W.2d 404, 407 (Iowa 1992); *Kelly v. Sinclair Oil Corp.*, 476 N.W.2d 341, 354 (Iowa 1991); *Anthony v. State*, 374 N.W.2d 662, 668 (Iowa 1985); and RESTATEMENT (SECOND) OF TORTS § 314 (1965)); *see also* RESTATEMENT (SECOND) OF TORTS § 315. "This may be true for those claims … which are based on an alleged failure of a

wrongdoer to control the conduct of a third party or to aid or protect another." *Kelly*, 476 N.W.2d at 354 (citing, *inter alia*, RE-STATEMENT (SECOND) OF TORTS § 314 cmt. *c*, and § 315). Rather, the Iowa Supreme Court has observed, "In cases involving a failure to take action we generally recognize a legal duty exists only if there is a special relationship between the parties." *Fiala*, 519 N.W.2d at 389 (citing cases). The special relationships that may give rise to such a duty are identified in RE-STATEMENT (SECOND) OF TORTS §§ 314A, 314B, 316–20. *Kelly*, 476 N.W.2d at 354. Allegation of a defendant's "knowledge" of another's mental disease or defect or propensity to inappropriate conduct, standing alone, is not enough to plead the required basis for a legal duty to protect. *Cf. Lindaman v. Bode*, 478 N.W.2d 312, 314 (Iowa Ct.App.1991) ("Lindaman pleads no such special relationship [as required under RE-STATEMENT (SECOND) OF TORTS § 314 and § 314A] existing between him and the Hoefts. Therefore, in the absence of a recognized duty on the part of the Hoefts, there can be no actionable negligence."). However, such a duty may arise from employment of the alleged wrongdoer by the defendant, *see* RESTATEMENT (SECOND) OF TORTS §§ 317 & 319, and such a duty is alleged in Count IX.

Although the negligent supervision/failure-to-protect claims against the employer failed in *Godar*, because the plaintiff had not shown that the employer knew, should have known, or even "should have been suspicious," about abuse or the potential for abuse, Doe has pleaded that the defendants knew of Hartz's "mental disease or defect" and the threat it posed to parishioners and members of the public. *See* Present Complaint, Count X, ¶ 80. Therefore, the impediment to such a claim found in *Godar* is not present here.

Consequently, the Church Defendants' motion to dismiss this claim on non-constitutional grounds will be denied. Because the remaining challenges to the negligent supervision claim are constitutional, the court will defer consideration of those challenges until it has determined which claims against each of the defendants are viable on non-constitutional grounds. *See Jean*, 472 U.S. at 854, 105 S.Ct. 2992 (" 'Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.' ") (citations omitted).

### 9. Premises liability

The defendants' challenges to Doe's premises liability claim against the defendant Church of St. Lawrence in Count XI of the Present Complaint need not detain the court for long. Doe conceded at oral arguments that this claim is untenable. Therefore, the defendants' motions to dismiss Count XI will be granted.

### 10. Respondeat superior liability

The final count of Doe's complaint asserts *respondeat superior* liability of "defendant St. Lawrence Church" for defendant Hartz's acts, because Hartz "was the representative agent and/or employee of Defendant St. Lawrence Church and the Roman Catholic Diocese of Sioux City." Present Complaint, Count XII, ¶ 92. Although the claim refers to Hartz as the employee or agent of both the Church and the Diocese, and Doe asserts in her brief that "the moving defendants" are vicariously liable for Hartz's misconduct, the count actually prays for relief only against St. Lawrence Church. *Id.* at prayer. The comparable claim in the Original Complaint was identical. Thus, only a claim of *respondeat superior* liability of St. Lawrence Church is actually pleaded, and only *respondeat superior* liability of St. Lawrence Church would be the "same claim" against the "same party," and thus "saved" pursuant to IOWA CODE § 614.10. Doe may therefore assert *respondeat superior* liability, if at all, only against defendant St. Lawrence Church.

The Church points out, however, that the authorities have "overwhelmingly" held that a church is not liable under a *respondeat superior* theory for sexual misconduct of a member of its clergy. Furthermore, the Church contends that Hartz's conduct was not "within the scope of his employment," because assaultive conduct in no way relates to Hartz's duties as a parish priest. Doe counters that Hartz's conduct was within the scope of his employment, because it occurred during normal business hours in the course of his normal duties, and such conduct was reasonably foreseeable because of his known history of sexual misconduct. She argues further that RESTATEMENT (SECOND) OF TORTS § 219(2) supports *respondeat superior* liability of the Church for Hartz's misconduct, even if it was "outside" the scope of his employment, because of her allegations of the Church's own negligence, and Hartz's "high rank" within the church, citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

### a. The Godar decision

In *Godar v. Edwards*, 588 N.W.2d 701 (Iowa 1999), the Iowa Supreme Court also reiterated the principles for *respondeat superior* liability under Iowa law:

> The well established rule is that under the doctrine of *respondeat superior*, an employer is liable for the negligence of an employee committed while the employee is acting within the scope of his or her employment. *Jones v. Blair*, 387 N.W.2d 349, 355 (Iowa 1986); *Sandman v. Hagan*, 261 Iowa 560, 566, 154 N.W.2d 113, 117 (1967). Thus, "[a] claim of vicarious liability under the doctrine of *respondeat superior* rests on two elements: proof of an employer/employee relationship, and proof that the injury occurred within the scope of that employment." *Biddle v. Sartori Memorial Hosp.*, 518 N.W.2d 795, 797 (Iowa

1994); *see also Vlotho v. Hardin County*, 509 N.W.2d 350, 354 (Iowa 1993).

We have said that for an act to be within the scope of employment the conduct complained of "must be of the same general nature as that authorized or incidental to the conduct authorized." *Sandman*, 261 Iowa at 567, 154 N.W.2d at 117. Thus, an act is deemed to be within the scope of one's employment "where such act is necessary to accomplish the purpose of the employment and is intended for such purpose." *Id.* at 566–67, 154 N.W.2d at 117. The question, therefore, is whether the employee's conduct "is so unlike that authorized that it is 'substantially different'." *Id.* at 567, 154 N.W.2d at 117. Said another way, "a deviation from the employer's business or interest to pursue the employee's own business or interest must be substantial in nature to relieve the employer from liability." *Id.* at 568, 154 N.W.2d at 118.

Section 229(2) of the Restatement (Second) of Agency (1957) lists the following factors to be considered in determining whether conduct of an employee may be characterized as occurring within the scope of the employee's employment:

> (a) whether or not the act is one commonly done by such servants;
>
> (b) the time, place and purpose of the act;
>
> (c) the previous relations between the master and the servant;
>
> (d) the extent to which the business of the master is apportioned between different servants;
>
> (e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;
>
> (f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

Comment a, concerning subsection (2), explains that the ultimate question in determining whether an employee's conduct falls within the scope of employment is

whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed.

Restatement (Second) of Agency § 229 cmt. a.

"Although the question of whether an act is within the scope of employment is ordinarily a jury question, depending on the surrounding facts and circumstances, the question as to whether the act which departs markedly from the employer's business is still within the scope of employment may well be for the court." *Sandman*, 261 Iowa at 569, 154 N.W.2d at 118 (deciding that question whether employee was acting within scope of employment was properly a question for the court, not jury); *cf. Mary KK v. Jack LL*, 203 A.D.2d 840, 611 N.Y.S.2d 347, 348 (N.Y.App.Div.1994) (noting that "scope of employment" is usually a jury question, but summary judgment is appropriate where there is no conflicting evidence or the facts are undisputed).

*Godar*, 588 N.W.2d at 705–06.

### b. Does Godar foreclose respondeat superior liability here?

At first blush, a *respondeat superior* theory of liability appears to be foreclosed here by the decision in *Godar*. In *Godar*, the court found that "it cannot reasonably be said that sexual abuse by [an employee] is 'of the same general nature' as that authorized by the school district in connection with his duties as curriculum director for the school district." *Godar*, 588 N.W.2d at 706. Similarly, it cannot reasonably be said that assault is "of the same general nature" as any conduct or duties authorized for a priest. Nor, the court in *Godar* found, could it be said that inappropriate acts by the curriculum director were committed "in furtherance of his duties." *Id.* Similarly, this court cannot find that Hartz's alleged inappropriate acts were committed in furtherance of some duty of his. Indeed, as in *Godar*, those acts are "substantially different" in nature from any authorized by the Church. *Id.*

In *Godar*, it was not enough that the alleged abuser had the opportunity to become acquainted with his victim by virtue of his duties with the school district, because his acts were not committed in furtherance of his duties or the objectives of the school district programs. *Id.* at 706–07. The court observed that "[t]he fact that Edwards' alleged conduct was incidental to duties authorized by the school district as curriculum director does not support a finding that the conduct furthered the educational objectives of the school district." *Id.* at 707. Similarly, here, the fact that Hartz's alleged assault was incidental to his duties as a parish priest does not support a finding that the conduct furthered the objectives of the Church. Nor was it enough in *Godar* that the abuse occurred on school district property, or that the abuse would not have occurred but for the abuser's employment by the school district. *Id.* Thus, these factors, also alleged here, are also insufficient.

However, in *Godar*, the Iowa Supreme Court also concluded that there "simply was no evidence to show that Ed-

wards' alleged conduct was expected, foreseeable, or sanctioned by the school district." Here, however, Doe has alleged that Hartz's misconduct was at least foreseeable, because the Church allegedly knew or should have known of Hartz's past misconduct, and his alleged "mental disease or defect" making such misconduct a realistic threat. Although this single factor in favor of a conclusion that Hartz was acting "within the scope of his employment," *see Godar*, 588 N.W.2d at 707; RESTATEMENT (SECOND) OF TORTS § 229(2)(f) (considering as a factor in determining whether conduct of an employee may be characterized as occurring within the scope of the employee's employment "whether or not the master has reason to expect that such an act will be done"), is a remarkably tenuous basis for imposing *respondeat superior* liability, it nonetheless appears to the court to be enough to defeat a motion to dismiss. As the Iowa Supreme Court noted in *Godar*, "the question of whether an act is within the scope of employment is ordinarily a jury question," and the court is reluctant at the motion-to-dismiss stage of the proceedings to determine that assault by a priest "departs so markedly from the employer's business." *See id.* at 706.

Doe does argue and allege that another basis for *respondeat superior* liability is that the Church required Hartz to dispose of all his "wordly good," making it just and appropriate to impose liability for damages on the Church for Hartz's wrongdoing, when Hartz cannot respond in damages under his vow of poverty. Doe has not cited any decision at all, let alone any decision of an Iowa appellate court, supporting imposition of *respondeat superior* upon a church on the basis of a "wordly good" allegation. Nonetheless, the court observes that such a consideration may be encompassed within RESTATEMENT factors and Iowa decisional law, because the question may be "whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed." RESTATEMENT (SECOND) OF TORTS § 229 cmt. a; *Godar*, 588 N.W.2d at 706. Disposition of the motion to dismiss the *respondeat superior* claim does not rest on this basis, however, because the parties have had inadequate opportunities to brief the question of the impact of the "wordly good" allegation on *respondeat superior* liability of the Church.[8]

Therefore, although it is with considerable reservations, the court will deny St.

---

**8.** Doe also asserts that the factors in RESTATEMENT (SECOND) OF TORTS § 219(2), specifically factors (b) (employer's own negligence) and (d) (employee's abuse of apparent authority and obtaining aid from the agency relation to accomplish the tort), are relevant both to "direct liability" and "indirect liability" of an employer for conduct of an employee that is *outside* the scope of employment. She relies on the discussion of employer liability under § 219(2) in the decision of the United States Supreme Court in *Burlington Indus. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In *Ellerth*, however, the Supreme Court found that subsection (b) would make an employer "liable when the tort is attributable to the employer's own negligence," but that this "minimum" standard

was not the "more stringent standard of vicarious liability" invoked by the plaintiff in that case. *Ellerth*, 524 U.S. at ——, 118 S.Ct. at 2267. Thus, subsection (b) is not applicable to a discussion of *respondeat superior* liability, but is instead pertinent, if at all, to Doe's claims of negligence by the Church Defendants.

However, the Supreme Court did consider subsection (d) to be pertinent to vicarious liability. *See id.* Again, the status of the briefing and record make it inappropriate for the court to pass, at the motion to dismiss stage, on the question of whether RESTATEMENT (SECOND) OF TORTS § 219(2)(d) is an appropriate basis for imposing *respondeat superior* liability on the Church in this case.

Lawrence Church's motion to dismiss the *respondeat superior* claim against it on non-constitutional grounds.

### 11. A constitutional bar?

█ Finally, the court turns to the constitutional challenges to the remaining claims, which would, of course, require granting the defendants' motions to dismiss in their entirety, if successful. Although the Church Defendants have expended much effort on demonstrating that Doe's "negligent hiring" claim is barred by the First Amendment to the United States Constitution, the court finds that Doe has specifically conceded that any "negligent hiring" claim is constitutionally barred. Indeed, as the table on page 8 reflects, the claim in Count IX of the Present Complaint, as distinguished from the comparable claim in the Original Complaint, is denominated only "negligent supervision." Thus, it appears from the revisions to the claim, as well as Doe's concession, that references to "negligent retention" and "negligent hiring" in the Present Complaint were inadvertent. In the interest of completeness, to the extent the Present Complaint attempts to state a claim for negligent hiring, such a claim is constitutionally barred in the circumstances alleged, and this portion of the Church Defendants' motion to dismiss this count will be granted.

Although the parties also expend much effort attempting to prove or disprove the contention that all of Doe's remaining claims are also barred by the First Amendment, the court finds that no constitutional bar requires dismissal of any of the remaining claims at this time. The court recognizes that a split in authority exists on whether any of these claims involves the court in unconstitutional "entanglement" with religion. *See, e.g., Doe,* 970 F.Supp. at 1428–33. In *Drevlow v. Lutheran Church, Missouri Synod,* 991 F.2d 468 (8th Cir.1993), the court explained the principles of the "entanglement" issue:

> It is a fundamental tenet of First Amendment jurisprudence that:
>
>> the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.
>
> *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 724–25, 96 S.Ct. 2372, 2387–88, 49 L.Ed.2d 151 (1976). The Constitution forbids secular courts from deciding whether religious doctrine or ecclesiastical law supports a particular decision made by church authorities. *Scharon v. St. Luke's Episcopal Presbyterian Hosps.,* 929 F.2d 360, 363 (8th Cir.1991).
>
> \*\*\*
>
> The First Amendment proscribes intervention by secular courts into many employment decisions made by religious organizations based on religious doctrine or beliefs. Personnel decisions are protected from civil court interference where review by civil courts would require the courts to interpret and apply religious doctrine or ecclesiastical law. [Citing cases omitted here.] The First Amendment does not shield employment decisions made by religious organizations from civil court review, however, where the employment decisions do not implicate religious beliefs, procedures, or law. [Citation omitted.]

*Drevlow,* 991 F.2d at 470–71 (footnote omitted).

However, as this court explained in its decision regarding the motion to dismiss

the previous incarnation of this lawsuit, the decision of the Eighth Circuit Court of Appeals in *Drevlow* counsels taking a "wait and see" approach to the question of "entanglement." In *Drevlow*, the court concluded that it was unable, at the motion to dismiss stage of the proceedings, "to predict that the evidence offered at trial will definitely involve the district court in an impermissible inquiry into the Synod's by-laws or religious beliefs" to decide the plaintiff's claims of libel, negligence, and intentional interference with his legitimate expectancy of employment arising from placement of false information in his personal file. *Id.* at 471. The court therefore reversed the district court's dismissal of the complaint and remanded for further proceedings. *Id.* at 472. However, the court cautioned that, "if further proceedings reveal that this matter cannot be resolved without interpreting religious procedures or beliefs, the district court should reconsider the Synod's motion to dismiss." *Id.* Thus, the *Drevlow* decision supports denial of the defendants' motion to dismiss any of the remaining claims on First Amendment grounds at this stage of the proceedings when the extent of any entanglement that may be required by adjudication of these claims cannot yet be determined. *Drevlow*, 991 F.2d at 471.

### III. CONCLUSION

Regarding defendants' "procedural" challenges to Doe's complaint, the court concludes first that diversity of citizenship plainly existed *at the time this action was filed.* Consideration of diversity, on the one hand, and relation back or "savings" for statute of limitations purposes, on the other, are separate inquires. Therefore, defendants' motions to dismiss for lack of subject matter jurisdiction are **denied.**

The defendants' motions to dismiss the claims as untimely are **granted in part and denied in part.** The claims, with one exception, are "saved" pursuant IOWA CODE § 614.10, because there was no "negli-

gence" in Doe's prosecution of the original action; the Present Complaint was brought within six months after the dismissal of Doe's Original Complaint; the parties are the same; and, in most respects, the causes of action are the same or *more narrowly* defined. However, the exception is the "tortious infliction" claim now asserted against the Church Defendants. **The defendants' motion is hereby granted and the "tortious infliction" claim against Soens and the Diocese is dismissed,** because this is an entirely new cause of action not asserted in the original action, and consequently, it was not or timely filed within the applicable two-year statute of limitations, and is not "saved" by § 614.10.

As to the last of the "procedural" challenges to the Present Complaint, the court concludes that defendants' motions to dismiss for failure to sue in plaintiff's proper name are **granted in part.** Upon consideration of pertinent factors, and acknowledging that the circumstances may be close to the line, the court concludes that prosecution of this litigation under a pseudonym is not appropriate, because Doe does not have a substantial privacy right that outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings. However, the complaint is *not* dismissed in its entirety; rather, Doe must amend her complaint to sue in her proper name *within thirty days of the date of this order.* Only if she refuses to do so will dismissal be appropriate.

Defendants' remaining challenges were substantive: They asserted that the various counts of the Present Complaint fail to state claims upon which relief can be granted. Just as the court found that the nature of the many claims presented in this litigation was perhaps best presented in tabular form, the court now finds that the most concise and coherent recitation of its conclusions on the disposition of the defendants' motions to dismiss specific claims is also in tabular form.

| Shorthand Description | Count of Present Complaint | Disposition of Defendant's and/or Defendants' Motion(s) to Dismiss |
|---|---|---|
| Sexual abuse | I | Doe's prayer for a judgment "requiring Defendant Hartz to receive professional counseling within the meaning of Iowa Code § 611.23" is **dismissed,** because such relief is only available under IOWA CODE § 611.23 "[i]n a civil action in which a plaintiff is seeking relief or damages for alleged sexual abuse as defined in section 709.1," IOWA CODE § 623.11, and Doe has not alleged a "sex act" within the meaning of IOWA CODE § 702.17, which is a requirement of a claim for damages founded on § 709.1.<br><br>To the extent Doe attempts to assert a claim of "sexual exploitation" within the meaning of IOWA CODE § 709.15, **defendant Hartz's motion is granted** and that claim is **dismissed,** because Doe has failed to allege sexual exploitation by a counselor or therapist within the meaning of IOWA CODE § 709.15 as the pertinent statute has been interpreted by the Eighth Circuit Court of Appeals.<br><br>**Defendants' motions are denied** to the extent that Doe has pleaded claims for assault and battery upon which relief can be granted. |
| Fraud | II | **Defendants' motions are granted and Count II is dismissed.** Lack of a legal duty to disclose—the first element of Doe's fraudulent concealment claim—is an "insuperable bar" to this claim. |
| Breach of fiduciary duty as to defendants Diocese and Soens | III | **Defendants' motion is granted and Count III is dismissed .** *Moses* does not establish the viability of the breach-of-fiduciary-duty claim Doe has actually pleaded against Soens or the Diocese; a *Moses*-style breach-of-fiduciary-duty claim (based on assumption of duty) is untimely; and, if such a claim were timely, Doe has failed to state a *Moses*-style claim upon which relief can be granted, because she has failed to allege injury.<br><br>The breach-of-fiduciary-duty claim actually pleaded fails to state a claim on which relief can be granted, because Doe has failed to allege adequately the basis for a fiduciary duty on the part of the Diocese and Soens, because there was no contact, and hence no basis for a fiduciary duty, prior to Hartz's misconduct; and the status of the Diocese and Soens, or any member of the clergy, is an insufficient basis for asserting such a duty. |
| Breach of fiduciary duty as to defendant Hartz | IV | **Defendant's motion is granted and Count IV is dismissed.** Doe has failed to allege a counseling relationship between Hartz and Doe, and a general priest-parishioner relationship is not enough to establish a fiduciary duty. |
| Assault | V | **Defendants' motions to dismiss Count V are denied.** The court found that the offense asserted in Count I was properly construed as an assault or battery, founded on the grabbing and kissing *and* the post-mass back rubbing. Thus, the back-rubbing incident is already encompassed within another assault and battery claim. The only different conduct upon which the present "assault" claim can be based is therefore the hand-shaking incident. The court finds that this incident may constitute an assault or battery as the elements of those torts were defined in section II.B.2.c. of this decision. |
| Tortious infliction of severe emotional distress | VI | **Defendant's motion is granted and Count VI is dismissed.** Although the conduct in question here may be odious, when compared to cases involving much more intrusive sexual misconduct by members of the clergy, defendant Hartz's conduct is not, as a matter of law, sufficiently "outrageous" to support a claim of tortious infliction of emotional distress. |
| Negligence as to defendant Hartz | VII | **Defendant's motion to dismiss is granted and Count VII is dismissed.** The court concludes that Doe is attempting to plead "negligent assault" and "negligent breach of fiduciary duty."<br><br>The court has found that Doe has failed to allege any fiduciary duty between Hartz and herself; therefore, she necessarily fails to state a claim that Hartz "negligently" breached such a duty.<br><br>The court concludes that there is no basis for this court to recognize a civil damages action for "negligent assault" under Iowa law. |
| Second count of negligence as to defendant Hartz | VIII | **Defendant's motion is granted and Count VIII is dismissed.** Doe has cited no authority—from Iowa or any other jurisdiction—for the proposition that a mental disease or defect of the kind identified gives rise to duties to restrain oneself from sexually abusing another or to obtain professional help to treat one's mental disease or defect and to refrain from sexually abusing another, and the court has found none. |

| Shorthand Description | Count of Present Complaint | Disposition of Defendant's and/or Defendants' Motion(s) to Dismiss |
| --- | --- | --- |
| Negligent supervision | IX | **Defendants' motion is denied.** The court concludes that Count X is, in most respects, duplicative of Count IX—the negligence alleged in Count X is fully encompassed within the specifications of negligence in Count IX—and the court considered Counts IX and X as a single claim of negligent supervision, reading the allegations of the two counts, and indeed of the complaint, as a whole. |
| Negligence as to defendants Church and Diocese | X | The Iowa Supreme Court's recognition of a claim of negligent supervision is sufficiently broad to encompass the present claim, because Doe has alleged assault by a priest on a parishioner, and that the employee, "because of [his] employment [as a priest], may pose a threat of injury to members of the public." Doe has also sufficiently pleaded a "special duty" on the part of the defendants and that they knew or should have known of Hartz's potential to injure a parishioner. |
| Premises liability as to defendant Church | XI | **Defendants' motion is granted and Count XI is dismissed.** Doe conceded that such a claim is untenable. |
| Respondeat superior liability as to defendant Church | XII | **Defendants' motion is denied.** Doe has alleged that Hartz's misconduct was at least foreseeable, because the Church allegedly knew or should have known of Hartz's past misconduct, and his alleged "mental disease or defect" making such misconduct a realistic threat. Thus, Doe has sufficiently alleged that Hartz was acting "within the scope of his employment" to defeat a motion to dismiss. Remaining challenges to and bases for the claim are better addressed upon a more complete record. |

Finally, the court concludes that defendants' motions to dismiss all remaining claims on constitutional grounds must be and hereby are **denied.** The *Drevlow* decision supports denial of the defendants' motion to dismiss at this stage of the proceedings when the extent of any "entanglement" in violation of the First Amendment that may be required by adjudication of these claims cannot yet be determined. *Drevlow,* 991 F.2d at 471.

**IT IS SO ORDERED.**